[Civ. No. 19480. First Dist., Div. One. Aug. 3, 1962.]

LAKE MERCED GOLF AND COUNTRY CLUB, Plaintiff and Respondent, v. OCEAN SHORE RAILROAD COMPANY et al., Defendants and Appellants.

Vernon W. Humber, Norman S. Menifee and Roy D. Reese for Defendants and Appellants.

John J. Healy, Healy & Robinson and Jacobs, Blanckenburg & May for Plaintiff and Respondent.

CONLEY, J.*—The defendants, Ocean Shore Railroad Company, a corporation, and Ocean Shore Railroad, Inc., a corporation, appeal from a decree quieting the title of the plaintiff, Lake Merced Golf and Country Club, a corporation, to a strip of land 60 feet in width crossing plaintiff's property which was originally granted for railroad purposes only by Spring Valley Water Company, a corporation, to the corporate predecessor of the appellants. The "right of way" enters the golf club's property on its northerly boundary and runs in a wide curve to lands of Henry Doelger lying

---

*Assigned by Chairman of Judicial Council.

westerly therefrom. (See *Ocean Shore R. R. Co.* v. *Doelger,* 179 Cal.App.2d 222 [3 Cal.Rptr. 706].)

The notice of appeal speaks of the "defendant and appellant" in the singular; the notice to prepare clerk's and reporter's transcript refers to the defendants in part in the plural and in part in the singular; counsel for the railroad company appeared below for both defendants; no specification is made in the appeal papers where "defendant" is mentioned as to which defendant is intended as appellant. It was conceded, however, by defendants' counsel at the trial that Ocean Shore Railroad, Inc., a corporation, has no present right to the land in question. In view of the ambiguity above mentioned we shall consider this appeal as being taken by both defendants but shall refer to "appellant" in the singular throughout the opinion. The trial resulted in a transcript of over 2,600 pages, besides numerous exhibits. A motion for new trial made on behalf of both defendants was denied.

After the Ocean Shore Railway Company (predecessor in interest of the defendants) was organized in 1905 for the purpose of constructing and operating a railroad along the coast from San Francisco to Santa Cruz, it acquired in 1909 by grant from the Spring Valley Water Company a right of way "for railroad purposes only" over the water company's property. The railroad was operated for a number of years on tracks which never reached continuously from San Francisco to Santa Cruz; a 27-mile gap in the line located part way between the two cities was bridged by bus service. In 1911 the company went into receivership, and its assets were transferred to the Ocean Shore Railroad Company, one of the defendants and appellant. This new corporation functioned as a public utility until the year 1920 when it applied to the California Railroad Commission and the Interstate Commerce Commission for permission to abandon operations as a public carrier. The request was granted by the two commissions, and the railroad company also filed with the California Secretary of State a certificate of diminution of stock, stating that it was no longer a public utility. The company removed its tracks and ties, sold its rolling stock, equipment and terminal facilities and made some 20 distributions of assets to its stockholders. In its official applications the company stated that it proposed to engage in no other business than that incidental to liquidation and that it did not intend to reestablish a railroad. Portions of the right of way were sold, and

substantial segments have been taken in eminent domain proceedings over the years from 1920 to date.

Ocean Shore Railroad, Inc., a Nevada corporation, at an intervening time held title to the assets for approximately one year, but then executed a reconveyance to the Ocean Shore Railroad Company, and it does not claim any present interest in the property.

In 1921 the Spring Valley Water Company contracted to sell to the plaintiff, Lake Merced Golf and Country Club, the land over which ran the right of way here in question. The Spring Valley Water Company also sold the adjoining property located west of the golf club property to Henry. Doelger.

On March 24, 1922, the railroad company filed a quiet title action against the Spring Valley Water Company and the golf club, and a *lis pendens* was duly recorded. A trial was carried through to judgment before Judge J. L. Hudner; the principal issue there litigated was whether or not there had been such an abandonment of the railroad right of way that title thereto merged again with the basic title of the Spring Valley Water Company; the golf club at that time claimed that it was an innocent purchaser for value without notice of the railroad's claim of a right of way and that the club had succeeded to complete title by reason of its grantor's right of reversion.

In January 1924 Judge Hudner decided that the railroad company had abandoned the right of way, but this decision was reversed on appeal (*Ocean Shore R. R. Co.* v. *Spring Valley Water Co.,* 87 Cal.App. 188 [262 P. 53]); the case was retried before Judge George F. Buck. On May 16, 1930, a new judgment was entered holding that the railroad company was the owner in fee of the right of way for railroad purposes only and that the removal of the tracks, the sale of the equipment and the orders of the two public utilities commissions permitting it to cease operations as a public carrier did not constitute sufficient evidence of an abandonment. This decree was affirmed upon appeal. (*Ocean Shore R. R. Co.* v. *Spring Valley Water Co.,* 218 Cal. 86 [21 P.2d 588].)

A group referred to in the record as the "Selah Chamberlain Associates," including Mr. George Middleton, acquired options from the railroad company for the purchase of the right of way and the stock of the corporation; this contractual

relationship was changed or renewed several times, and after the filing of the remittitur from the Supreme Court affirming the Buck decree the options are claimed to have been exercised. The relationship between the railroad and the Selah Chamberlain Associates will be referred to in more detail in the course of the opinion.

On May 28, 1957, Lake Merced Golf and Country Club filed the present action to quiet title. Shortly before that time the railroad company commenced a suit to quiet title to its right of way across the Doelger property to the west of the land presently involved. In the first trial of that case, Judge Murray Draper presiding, a judgment was entered in favor of the Ocean Shore Railroad Company to the effect that the railroad company had not abandoned the right of way over the Doelger property. That decree was reversed by this court on appeal (*Ocean Shore R. R. Co.* v. *Doelger*, 127 Cal.App.2d 392 [274 P.2d 23]), the holding being that the Buck decree did not establish the right of the railroad company to fee ownership of the land, that the company had had only an estate of inheritance to the right of way for the limited purpose of the operation of a railroad, and that while the Buck decree was res judicata as of the time of its entry, it did not determine the issue of abandonment after that date. The cause was remanded for retrial. A petition for rehearing and a petition for a hearing by the Supreme Court were successively denied.

The *Doelger* case, retried before Judge Louis B. DeMatteis, resulted in a decree holding that the plaintiff was not entitled to recover in that it had in fact abandoned the right of way for railroad purposes after the entry of the Buck decree and that title had merged in the Spring Valley Water Company and in Doelger as its successor in interest. In *Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, the decree of the court below was affirmed by this court. A petition for rehearing and a petition for hearing by the Supreme Court were denied.

The instant case was still being tried while the *Doelger* case was under appeal. In the present suit all of the applicable evidence in the *Doelger* case was received by Judge Arthur L. Mundo by stipulation, and additional evidence was introduced by the contending parties. Understandably, appellant expresses concern in its briefs that this court, without considering the additional evidence and the new arguments

advanced, will adopt the conclusion reached in the *Doelger* case and affirm the present judgment on the strength of that authority alone. The respondent, on the other hand, insists that the result of the *Doelger* litigation must be accepted and necessarily followed by this court; it is pointed out that both Henry Doelger and the golf club derived their titles in similar fashion from Spring Valley Water Company, that all of the evidence in the *Doelger* case which led to an affirmance by this court was introduced at the present trial, and that therefore the parallel holding of abandonment by Judge Mundo must be sustained without further inquiry. The respondent says: ''Practically identical findings were made against the Ocean Shore in the companion litigation which was affirmed. . . . Now that this Court has rendered its final decision in *Ocean Shore R. R. Co.* v. *Doelger,* 179 Cal. App.2d 222 [3 Cal.Rptr. 706], it would appear that Appellant Ocean Shore is precluded and estopped from presenting a meritorious appeal.'' (Citing, among other cases, *Bernhard* v. *Bank of America,* 19 Cal.2d 807 [122 P.2d 892], and *Clark* v. *Deschamps,* 109 Cal.App.2d 765, 768 [241 P.2d 681].)

 We cannot agree with respondent's suggestion. While title to the respective lands involved in the two cases was derived from the Spring Valley Water Company under similar circumstances, there is such diversity of parties in the two cases that the doctrines of res judicata or of ''the law of the case'' cannot apply; in the *Doelger* case the railroad was plaintiff, and the golf club was not a party; in the present suit the golf club is plaintiff, and Doelger is not a party; the lands involved are different; additional testimony was received in the present case, and the appellant is not bound herein by the *Doelger* decision. However, we must give due weight to its statement of the law as applied to those facts which are identical in the two cases. (*Kerns* v. *Dean,* 77 Cal. 555, 558 [19 P. 817].) That decision constitutes external persuasion rather than the internal binding force of res judicata or ''the law of the case.''

The appellant makes the following contentions on the appeal:

(1) That the Selah Chamberlain Associates, or their successors in interest, were indispensable parties to this litigation, and that as they were not joined by an order of the court *sua sponte,* or otherwise, the judgment is void.

(2) That the Ocean Shore Railroad Company as the alleged

holder of the naked legal title to the railroad right of way as a trustee for the associates, was incapable of forming an intent to abandon the right of way and that the finding that it did so makes the judgment erroneous.

(3) That by reason of the doctrine of res judicata, the Buck decree prevents recovery by plaintiff.

(4) That the evidence of the intention of the railroad company to abandon the right of way was insufficient as a matter of law.

(5) That the holding by the trial court that the right of way was abandoned not only is erroneous in itself but violates rights guaranteed to the railroad under the Constitutions of California and of the United States.

(6) That laches, waiver and estoppel on its part preclude the quieting of the title in the golf club.

(7) That the plaintiff has failed to establish its own title by not tracing it to its source before the Spring Valley grant.

WERE THE SELAH CHAMBERLAIN ASSOCIATES OR THEIR SUCCESSORS IN INTEREST INDISPENSABLE PARTIES TO THE LITIGATION SO THAT THE OMISSION TO JOIN THEM MADE THE JUDGMENT VOID?

Appellant contends that as the record indicates that the so-called Selah Chamberlain Associates, a joint venture or partnership formed to acquire the right of way and the capital stock of the railroad corporation, or their successors or survivors, were not joined as indispensable parties defendant, the judgment is void. It may be conceded at the outset that one or more of the associates or their legitimate successor or successors were conditionally necessary parties (Code Civ. Proc., § 389), but it by no means follows that they were indispensable parties.

The opinion of Mr. Chief Justice Gibson in *Bank of California* v. *Superior Court,* 16 Cal.2d 516, 521 [106 P.2d 879], makes clear the distinction between merely necessary parties and indispensable parties. ▇▇▇ The opinion (p. 521) quotes with approval the following excerpt from Clark, Code Pleading, page 245, note 21: " 'While necessary parties are so interested in the controversy that they should normally be made parties in order to enable the court to do complete justice, yet if their interests are separable from the rest and particularly where their presence in the suit cannot be obtained, they are not indispensable parties. The latter are

those without whom the court cannot proceed.' '' The opinion at page 523 states that necessary parties ''. . . should normally be joined, and the court, following the equity rule, will usually require them to be joined, in order to carry out the policy of complete determination and avoidance of multiplicity of suits. But, since the rule itself is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicability. Where, for example, it is impossible to find these other persons or impracticable to bring them in, the action may proceed as to those parties who are present.''

In their answer, the defendants allege that Ocean Shore Railroad Company, a corporation, ''. . . is the owner and holder of legal title to said right of way . . . and that others, not named either as parties plaintiff or parties defendant in this action, have an interest, right, title or claim in and to said property; that said parties are George Middleton and Harry W. Cole, sole survivors of that certain joint venture known as and called Selah Chamberlain Associates, a joint venture, are the equitable owners of all of the right, title, interest, claims, easements, rights of way and other interests in said right of way for railroad purposes only, the legal title to which is held by Ocean Shore Railroad Company, a corporation, and these defendants pray that said George Middleton and Harry W. Cole, individually, and as the surviving members of the joint venture known as and called Selah Chamberlain Associates be joined as parties defendant to this action so that their rights in and to said property may be settled and determined. . . .''

While the use of the term ''Selah Chamberlain Associates'' would indicate on its face that the associates constituted an organization of some specific kind, the record is peculiarly silent with respect to any basic agreement under which such association was formed. Whether it was originally a partnership or a joint venture or an amorphous grouping of individuals does not clearly appear from the record. The names of numerous constituent individuals were bandied about during the course of the long trial, among them being: Selah Chamberlain, the heirs of Selah Chamberlain, George Middleton and his father, Harry W. Cole, Cleonce Clar, Henry Stoddard and Bishop Nibley. There is no record of formal agreements as among themselves. It was stated during the course of the trial that all of them are deceased except George

Middleton and Harry W. Cole, and now the suggestion is made, although there is nothing in the record on appeal to sustain it, that Mr. Cole has since died. The evidence shows that some of the essential options were taken in the name of Selah Chamberlain personally and some in the name of George Middleton personally, and there were assignments back and forth among various parties. Furthermore, the record indicates that Mr. Chamberlain and Mr. Middleton constituted a partnership entirely separate from the associates, a "circle within a circle," to use a phrase employed by the trial court. Whether the death of any of the associates terminated the alleged partnership or joint venture, who, in fact, among the groupings of parties or their estates have rights in or to the various items of property, whether the Chamberlain-Middleton partnership as distinguished from the so-called associates has varying rights in the matter, are all unanswered questions. All of these factors made it practically impossible for a trial judge to act helpfully and intelligently on the suggestion of defendants that it order the joinder of additional parties defendants.

In passing, it may be observed that the moral position of the appellant in now claiming that the associates are indispensable parties to the litigation is not unassailable. It is urged by appellant that Mr. Middleton, as the alleged last survivor of the Selah Chamberlain Associates, should have been made a party defendant by order of the court on its own motion. But Mr. Middleton, who for many years has been vice president and general manager and a director of the railroad company and who was the principal witness on behalf of the railroad, made no attempt to intervene on behalf of the associates in the current litigation. Good faith, it is suggested, would have impelled him to take this step, and good faith is of the essence in equitable proceedings. In its memorandum of the decision the trial court says: "A pretrial order in the instant case was entered May 19, 1958. Apparently the contention that Middleton and Cole should be joined as parties was not urged at that time. The matter was considered at issue with the Railroad Company and Railroad Company, Inc., as the only parties Defendant. Neither party during the trial herein moved the joinder of Middleton and Cole as parties, but Counsel for the Railroad Company intimated that the Court *sua sponte* should bring them into the case. At the instance of Counsel for the Plaintiff that

Plaintiff seeks a decree against named Defendants only, the Court, considering the premises, made no ruling upon the question.''

It is advisable at this juncture to correct a misconception entertained by appellant with respect to the relative legal positions of the railroad and the associates. Appellant contends that by the payment of $100,000 by the associates to the railroad company the latter became the trustees of a resulting trust. Appellant cites well-known authorities holding that if full consideration for the purchase of real property is paid by one party to a grantor and title is taken in the name of a grantee who did not advance such consideration, there is a resulting trust under which the grantee holds the bare legal title for the benefit of the person who made the payment. That is not the situation here. Although the $100,000 was in fact paid by the associates to the railroad company and a deed was not delivered by the railroad company to the associates, no trust relationship was created; instead, the relationship was that of a vendor and a purchaser who has not taken delivery of the deed for which he has paid. The railroad company has simply not completed the performance of its contract with the associates, and the associates have never demanded delivery. The effect of their dealing is that there is an uncompleted contract for the sale of the right of way by the railroad to the associates.

It is, of course, well established that in a quiet title action a court may not adjudicate the rights of one who is not a party to the action. (*Hurt* v. *Jones,* 147 Cal.App.2d 164, 168 [304 P.2d 786]; *Overell* v. *Overell,* 18 Cal.App.2d 499, 502 [64 P.2d 483].)

A purchaser of real property who has not fulfilled all of the conditions of a sales agreement before the bringing of an action to quiet title against the vendor has an interest which is not affected by litigation to which he is not made a party. While in these circumstances he would be a conditionally necessary party, he would not be an indispensable party. In *Lee* v. *Silva,* 197 Cal. 364, 373 [240 P. 1015], it is said: ''It is the rule generally that a person having acquired a contractual interest in land, even though the contract be executory in its nature, prior to the institution of an action affecting the land, must be made a party to the action and if not so made a party will retain the right to clothe his equity with the legal title as if no action has been instituted, and this is so even though such person does not complete the payment of

the purchase price of the land nor receive a conveyance of the legal title thereto until after the institution and during the pendency of the action. The effect of this rule is that the purchaser under an executory contract of purchase and sale made before the institution of an action affecting the land is a prior purchaser, whose rights therein are not subject to a subsequent *lis pendens*."

And in *Holman* v. *Toten*, 54 Cal.App.2d 309, 314 [128 P.2d 808], the court said: "The California rule is that a judgment 'concludes not only the adverse party but also all those claiming under the title which he represented." (*Estate of Clark* (1923) 190 Cal. 354, 360 [212 P. 622].) But, 'one who acquired his interest in the matters in litigation from a party before the commencement of the suit . . . is not a successor in interest within the meaning of the rule and is not bound by a subsequent judgment, unless . . . a statute provides otherwise where the transfer has not been recorded as prescribed.' [Citations.]"

█ We conclude that as the associates under their construction of the facts would not be bound by the judgment in the instant litigation, because they commenced the acquisition of their interest prior to the filing of the instant case and before some of the alleged acts of abandonment, they are not indispensable parties; their presence was not jurisdictional, and their absence does not render the judgment void.

█ As the successors of the associates were conditionally necessary parties only, and as the defendants did not make clear to the court their identity, their availability or the grounds upon which their alleged rights were based, the court committed no error in failing to order their joinder. Section 389 of the Code of Civil Procedure provides in part: "When it appears that a conditionally necessary party has not been joined, the court shall order the party asserting the cause of action to which he is conditionally necessary to bring him in *if he is subject to the jurisdiction of the court, if he can be brought without delay, and if his joinder will not cause undue complexity or delay in the proceedings.*" (Emphasis added.)

### DID THE OCEAN SHORE RAILROAD COMPANY HAVE THE CAPACITY TO FORM AN INTENTION TO ABANDON THE RIGHT OF WAY?

Closely allied with the preceding point is the contention of the appellant that the railroad company was a bare trustee

and therefore did not have the capacity to form an intention to abandon the right of way. This point was suggested in appellant's closing brief in the second *Doelger* appeal (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222), but this court then refused to consider it because it was not raised in appellant's voluminous opening brief. (P. 239, note 3.) It is based on the contention already discussed that after the exercise by the Chamberlain Associates of the option to purchase the right of way the railroad company became a trustee holding only the naked title to the land. As we have seen, this contention is erroneous in that the relationship between the railroad and the associates was not that of trustee and beneficiary but that of vendor and purchaser in connection with an uncompleted contract.

It has been noted already that this is a quiet title action running against the named defendants only, and we see no reason why the suit should not be carried to final judgment as against the appellant. ▮ A vendor of an uncompleted contract for the sale of real property may form an intention to abandon title, even though such intention may run contrary to its contractual duties to the purchaser; as this judgment is designed to conclude only the rights of the named defendants, it is clear that the argument made by the appellants that they could not form an intent to abandon real property which was subject to a contract of sale is erroneous.

### Does the Doctrine of Res Judicata Preclude the Judgment in Favor of Plaintiff and Respondent?

▮ Appellant argues that as the Buck decree is res judicata, its existence prevents recovery by plaintiff and, furthermore, that the trial court erroneously admitted evidence of facts relating to abandonment which occurred prior to that decision. It is, of course, true that up to the time of the Buck decree the decision of that court, approved on appeal, is final and conclusive. However, there is nothing in logic or law to prevent proof of an abandonment of the right of way occurring after the Buck decree. In order to separate and segregate the acts and omissions which took place prior to the Buck judgment and afterwards, and to furnish a basis for understanding the relationship of later acts and omissions to those that precede the decree, it was proper for the trial court to receive evidence of what occurred before that decision, as well as afterwards.

Res judicata is binding solely as to acts and omissions which occurred prior to the former adjudication. Subsequents acts and omissions do not come within the bar so established. Such evidence may show that conditions have changed and in related cases this court and the Supreme Court have determined that conditions have, in fact, changed. (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 127 Cal.App.2d 392, 402; *People* v. *Ocean Shore R. R., Inc.,* 32 Cal.2d 406, 418-419 [196 P.2d 570, 6 A.L.R.2d 1179].) The evidence relied upon in *People* v. *Ocean Shore R. R., Inc., supra,* is stated as follows, at page 419: ''In the present case the facts are not the same, and the Spring Valley decision is not res judicata. Here the railroad operation was discontinued more than 14 years prior to the commencement of the action, there has been no resumption of service, and there was evidence that increased motor travel and other factors had made it economically infeasible to operate a railroad. Morever [*sic*], there were continued representations that the company was not a public utility, that it was in liquidation, and that it did not intend to engage in business other than that incidental to liquidation. We thus have evidence of subsequent facts which, when considered with the prior circumstances, would support a finding of intent to abandon even though we accept as controlling the determination of that case that there had been no abandonment when that action was commenced in 1922.''

In *People* v. *Ocean Shore R. R., Inc., supra,* 32 Cal.2d 406, the parties were not entirely the same as in the action which resulted in the Buck decree. However, the Supreme Court did not base its decision on that point. Instead, it conceded the applicability of the doctrine and did consider evidence of acts prior to the Buck decree. How could the trial court or this court possibly determine whether or not conditions had changed if no evidence of prior acts could be admitted? It is only by comparing ''old'' and ''new'' evidence that such a determination could be made.

Besides the subsequent evidence of abandonment considered on the first *Doelger* appeal and in *People* v. *Ocean Shore R. R., Inc., supra,* 32 Cal.2d 406, there is additional evidence of abandonment in the present record. As late as 1950, appellant's corporate minutes provide a positive memorial of appellant's intent to dispose of its right of way.

Appellant's related contention that the subsequent acts may not constitute abandonment because the nonuser was involun-

tary was rejected in *People* v. *Ocean Shore R. R., Inc., supra,* at page 419, and need not be repeated here. The testimony of experts as to the deteriorating condition of the right of way, the progressive falling off of railroad business as compared with bus and truck traffic, the economic impossibility of financing a revival of the railroad, the hopeless segmentation of the right of way through condemnation suits and voluntary conveyances, the numerous eloquent photographs showing present conditions, all support and amplify the conclusion of the *Doelger* case with respect to abandonment.

There is ample evidence of facts subsequent to the Buck decree to support the trial court's finding of abandonment. And the admission of the evidence complained of was necessary to permit the trial court to determine whether or not conditions have changed; there was no error in admitting it.

### WAS THE EVIDENCE OF THE INTENTION OF THE RAILROAD COMPANY TO ABANDON THE RIGHT OF WAY LEGALLY SUFFICIENT?

Appellant contends that three elements must coexist to establish abandonment of an easement: (1) nonuse or physical abandonment; (2) an intention by the holder of the dominant tenement to abandon; (3) a reliance by plaintiff upon such nonuse and intent, proven by expenditures made by plaintiff upon its own estate to its damage. Appellant bases this statement upon *Smith* v. *Worn,* 93 Cal. 206, 212 [28 P. 944], and *Davidson* v. *Ellis,* 9 Cal.App. 145 [98 P. 254]. It maintains that the triple test continues unchanged to the present date with the exception of a statement in the second *Doelger* opinion that the test "has been superseded by the dual test of nonuser and intent" (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 235), and contends that the five cases cited in the opinion in the last-mentioned case in support of the dual test give no indication that the original rule has been altered. One of the cited cases, *People* v. *Southern Pac. Co.,* 172 Cal. 692, 700 [158 P. 177], states the rule in terms of the dual test, requiring proof only of nonuse and intent to abandon as the necessary elements of abandonment; however, in that case the court found that there was no intent to abandon and therefore the issue of reliance never arose. In *Home Real Estate Co.* v. *Los Angeles Pac. Co.,* 163 Cal. 710, 714-715 [126 P. 972], the court considered only two elements, nonuser and intent, in finding an abandonment of a railroad right of way; nowhere in that opinion does the court discuss reliance

by the owner of the servient tenement as an element. The other three cited cases (*Parker* v. *Swett*, 40 Cal.App. 68, 74 [180 P. 351]; *Watson* v. *Heger*, 48 Cal.App.2d 417, 420-421 [120 P.2d 153]; *Whelan* v. *Zahniser*, 92 Cal.App.2d 770, 775 [207 P.2d 629]) hold that mere nonuser is not sufficient to constitute abandonment and that there must also be an intent to abandon; in each case the court found that there was no evidence of such an intent, and therefore the question of reliance did not arise.

17A American Jurisprudence, section 172, page 779, lists only the two requisite elements of abandonment stated in the second *Doelger* case. Although no later case has specifically held the rule announced in the *Smith* opinion to be error, the failure of the courts to mention the third element of reliance, and the holding in the *Home* case which ignored the element (although if applicable it properly deserved consideration therein), lend weight to the holding in the second *Doelger* opinion that the test is now changed.

The element of reliance has no logical place in the theory of abandonment. Abandonment depends solely upon the acts and intentions of the owner of an easement, for it is he who abandons the easement. The owner of the servient tenement in the instant case does not gain an easement, but merely clears its own title of a former existing obligation.

It should be observed, also, that even if the rule announced in the *Smith* case were still in effect, the trial court noted that: "The Club expended large sums of money developing its golf course. Some of the construction was placed over and upon the right of way in question with no attempt on the part of the Railroad Company to prevent it or demand that construction be removed."

The trial court was thus of the opinion that respondent did in fact rely upon appellant's acts and omissions and made expenditures based thereon. Appellant attacks this finding by pointing out a conflict or uncertainty in the evidence as to the location of the construction. However, the trial court weighed this conflict and determined it against appellant.

Turning to a consideration of the two necessary elements of abandonment, the railroad company does not argue that there was lack of proof of nonuser. Instead it attempts to explain the nonuser and relies upon the claim that the trial court was not justified in finding an intent to abandon, arguing that the only evidence of intent was the nonuser itself. This

contention is unsound, for there is ample evidence to support the finding of intent to abandon. Appellant not only stopped using the right of way, it took up the tracks, allowed others to use the right of way and sold portions thereof in other areas, thereby rendering future use of the railway impossible. As the Buck decree provided that the easement was for railroad purposes only, these acts show an intent to abandon the right of way (*Home Real Estate Co.* v. *Los Angeles Pac. Co., supra,* 163 Cal. 710.)

Appellant next contends that there can be no abandonment where it would be in favor of "a particular person" and not the world at large, citing *Richardson* v. *McNulty,* 24 Cal. 339, 344-345, which involved the abandonment of a mining claim; there the State of California owned the servient tenement. Naturally, that case differs from the instant suit where a private party owns the servient tenement; the theory as to the result of abandonment here is that the easement is extinguished, leaving the servient estate unencumbered.

Appellant argues that abandonment must be voluntary, yet it does not attempt effectively to show that the present abandonment was not voluntary. This contention is specious; there is sufficient evidence to justify the finding that appellant voluntarily discontinued the use of the railroad.

On the second *Doelger* appeal this court considered the evidence relating to abandonment and found it sufficient to sustain the judgment. (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 228.) Following the analysis supporting that decision, the same result must ensue in the instant case.

1. *The railroad's liquidation*:

"The railroad in 1930 applied to the Corporation Commission[er] for a permit authorizing it to divide and distribute $65,554.57 in cash to its shareholders upon the basis that 'said corporation is in liquidation, and has been since 1920, and is not engaged in, nor does it propose to engage in business of any kind other than such as is appropriate or incidental to such liquidation.' " (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 228.)

Appellant admits that the railroad company did apply to the Railroad Commission and to the Interstate Commerce Commission for permission to discontinue service. Appellant seeks to avoid these facts, not on the ground that it did not

discontinue services and distribute its assets, but on the claim that Selah Chamberlain Associates did not do so. However, Selah Chamberlain Associates are not parties to this litigation, and their rights, if any, are not now being determined. Furthermore, appellant concedes that the associates are not licensed or qualified to carry on the duties of a public utility.

Respondent cites further evidence of the liquidation of the railroad. The exhibits include the applications by the railroad and representations to the Interstate Commerce Commission and to the Railroad Commission; and the minutes of the board of directors of the railroad showing an intention by the board to dispose of portions of the right of way. The basis of the applications to the Railroad Commission and the Interstate Commerce Commission was that the company could not economically operate the railroad and intended to discontinue its services as a public utility.

Mr. Middleton's testimony shows that the last train ran in February of 1921, and that the tracks were taken up shortly after that. Following discontinuance of service, the railroad sold all of its rolling stock, including cars and locomotives. This factor merely adds further support to the finding that Ocean Shore ceased to operate as a railroad at some time following operation of the last train over the rights of way.

2. *Rehabilitation work following condemnation actions*:

In the second *Doelger* appeal this court found that certain rehabilitation work on the railroad began in 1933, *following* commencement of condemnation actions by the state, the effect of which would be to sever the right of way. The evidence is such that the trial court could well conclude that the attempts to rehabilitate were merely of a token nature and in fact the methods used were so paltry and insufficient in view of the asserted end that the finder of fact could legitimately conclude that there was no honest attempt to rehabilitate the railroad, but that the work were merly undertaken to enhance damages in ensuing litigation. Testimony in the instant case shows that the work did not conform to general engineering practices and was not the usual and accepted method of laying out a railroad. Evidence in the second *Doelger* appeal, read into the present record, showed that many of the normal steps of construction were omitted and that the work was admittedly " 'of an extremely preliminary nature.' " (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 228-229.) In short,

the trial court could legitimately conclude that the "rehabilitation" work was a hoax.

Evidence in the instant record includes the testimony of Merrill Adams, a witness in the *Doelger* trial and a contractor who worked on the right of way in 1935, of Edward Poss, a state construction engineer, and of Edwin Smith, a civil engineer who worked on part of the right of way. Each of these witnesses testified to the progressive deterioration of the roadbed and its unsuitability for the laying of track. The work done by Ocean Shore appears to have been nominal in view of the large scope of the job of rehabilitating a railroad. Appellant does not deny this evidence, but argues that it is irrelevant, claiming that under the rights adjudicated in the Buck decree appellant was not required to do *any* work and that the extent and manner of operations were of no importance in showing abandonment. However, the trial court owed the duty to examine all of appellant's activities and the apparent motives behind them to determine intention. The trial court performed this function and found that this evidence disclosed an intent not to operate a railroad and the further intent to abandon the easement; it must be constantly borne in mind that the easement from the time of the original grant was " 'for railroad purposes only.' " (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 127 Cal.App.2d 392, 399.)

3. *Growing Crops*:

In both the *Doelger* trial and the present case the court received evidence that a Mr. Lagomarsino planted crops along portions of the right of way in the vicinity of Westlake. The testimony indicates that Mr. Lagomarsino farmed on land now comprising the golf club from the time the railroad ceased operations until the time the golf club was established. He left only enough room along the right of way to drive a truck or team of horses. At no time did he see the railroad maintain or attempt to rehabilitate its right of way.

4. *Costs of reconstruction*:

We find testimony that the cost of rehabilitating the right of way from Skyline and Alemany Boulevards to Tunitas would be in excess of $6,000,000 and that in view of the minimal prospective freight tonnage, rehabilitation would be economically unfeasible. There was also testimony that a similar railroad serving the Napa and Calistoga areas was forced to abandon operations, in conformity with the present

universal trend, although it ran through the fertile Napa Valley. (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal. App.2d 222, 229.)

Additional evidence to this effect was presented in the instant action by Mr. Frank Guy, a civil engineer who has served various railroads since 1900 and is now engaged as a consulting engineer specializing in railroad work; he testified to the extreme cost of rehabilitation and the general trend toward abandonment of railroad lines. J. G. Hunter, former director of the transportation department of the Public Utilities Commission, made studies of the right of way and testified that he did not believe that the railroad, if rehabilitated, could be run at a profit; he considered that the economic situation at this time would be more unfavorable than at the time the last train operated; in fact, Mr. Hunter stated that the railroad could not even earn enough to pay the interest on the rehabilitation costs, and that these financial conditions would be weighed by the Public Utilities Commission in deciding whether or not it would issue a certificate of public convenience and necessity.

Appellant notes that "[t]he Associates spent considerable money and time in retaining the experts of the day to prepare long and complete reports as to the economic feasibility of rehabilitating the Railroad's line." Assuming the truth of appellant's assertion, it does no more than create a conflict in the evidence.

Ocean Shore Railroad Company contends that it is immaterial whether it really intended to rehabilitate or operate the railroad, that it owned the property in fee and could do anything with it that it desired, citing various cases, including *Ocean Shore R. R. Co.* v. *Spring Valley Water Co., supra,* 87 Cal.App. 188, 191. Indeed, the last cited case states that Ocean Shore owns the right of way in fee and could convey it in writing if it so desired. But appellant ignores the language in the Buck decree that the easement is for railroad purposes only. (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 127 Cal.App.2d 392, 396.) Therefore, any evidence which tends to show abandonment of the purpose of operating a railroad also tends to show abandonment of the easement.

5. *Conveyances of the right of way*:

In the second *Doelger* appeal and in the present record there is ample showing that appellant has voluntarily conveyed or

otherwise lost various substantial sections of its right of way. (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222, 229.) The recent decision in *Ocean Shore R. R. Co.* v. *City of Santa Cruz,* 198 Cal.App.2d 267 [17 Cal.Rptr. 892], involves the loss of a portion of the right of way to the City of Santa Cruz through the operation of the statute of limitations.

Appellant, in rebuttal, notes instances where the associates, not the railroad, purchased various parcels of property in their own names, allegedly with the intention of resurrecting and completing the right of way. However, the court sustained objections to questions put to Mr. Middleton relating to the alleged purpose for which various properties were purchased. Apparently certain properties were sold to diverse buyers with a reservation of a right of way. Appellant admits that there is a conflict in the evidence on this subject, merely stating that respondent's evidence is "innocuous." Despite the tremendous mass of exhibits introduced by defendants there is ample evidence and prior case history to support a finding that appellant, in conveying portions of its right of way, intended to abandon the only purpose for which it could properly use the easement.

Counsel call attention to the fact that taxes on almost all of the parcels of property remaining in the name of appellant have been paid. (Citing *People* v. *Southern Pac. Co.,* 172 Cal. 692 [158 P. 177].) The record is not completely satisfactory on this subject; it is nowhere stated explicitly that the railroad company itself paid the taxes in question, although that inference may be drawn. If the taxes were paid by the owners of the servient tenements, then this evidence would not aid appellant. In fact, the owners of the servient tenements would have to pay the taxes if appellant failed to do so, or the property would be subject to a tax sale. In any event, this is only one item of evidence; the court had the right and duty to weigh all the evidence in arriving at a finding of abandonment.

As in the last *Doelger* appeal (*Ocean Shore R. R. Co.* v. *Doelger, supra,* 179 Cal.App.2d 222), we find that the evidence is sufficient to sustain the court's finding of abandonment.

DOES THE JUDGMENT VIOLATE APPELLANT'S CONSTITUTIONAL RIGHTS?

The railroad company maintains that the judgment violates provisions of the California Constitution (art. I,

§§ 1, 13) and of the United States Constitution (Fourteenth Amendment) in that it deprives appellant of a vested right, established by the Buck decree, upon evidence of abandonment offered by the respondent subsequent to 1933 which is either totally lacking or is so weak that it is "fundamentally unfair" to deprive the appellant of its property on a judgment based thereon. (Citing, among other cases, *Chicago B. & Q. Ry. Co.* v. *City of Chicago,* 166 U. S. 226 [17 S.Ct. 581, 41 L.Ed 979], and *Shelley* v *Kraemer,* 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441], and related cases.) The essence of the claim is that the instant judgment constitutes a taking of property without due process of law and without just compensation. There is no constitutional question involved. If appellant's present alleged rights are established by res judicata or otherwise, or if there is not sufficient evidence to sustain the judgment, then the decree would have to be reversed, irrespective of any provision of the state or federal constitutions. The same contention might be made upon any appeal from any judgment involving property; it is ingenious but meritless.

### Did Laches, Waiver or Estoppel Preclude the Quieting of the Title of the Plaintiff and Respondent?

 Appellant urges that respondent's failure to institute quiet title proceedings at an earlier date precludes respondent from recovering judgment. The trial court properly answered this argument by stating in its memorandum opinion: ". . . it may well be true that the Club took title to its property with knowledge that there had been a railroad right of way across it and that the Club later recognized that Mr. Middleton and others were still claiming the existence of the right of way, but such knowledge and action on the part of the Club could not breathe life back into the easement lost to the railroad company by its own retirement from the railroad business and placing itself in a position where it became impossible to restore the right of way to use for railroad purposes in accordance with the grant of 1909."

 Laches has no place in this quiet title action. If appellant's title is defective, it is not cured by passage of time while appellant was not in possession. (*Secret Valley Land Co.* v. *Perry,* 187 Cal. 420, 425 [202 P. 449].) " ' [W]here a plaintiff has been in possession of land, he cannot be guilty of laches in the bringing of a suit to remove a

cloud at any time before an action has been brought to disturb his possession, or to deprive him of any enjoyment of his right. (*Liebrand* v. *Otto*, 56 Cal. 242, 248.) The continued assertion of an adverse claim constitutes from day to day a new cause of action.'" (*Wareham* v. *Randolph*, 184 Cal. App.2d 218, 227 [7 Cal.Rptr. 483], quoting from *Hyde* v. *Redding*, 74 Cal. 493, 500 [16 P. 380].)

It was not incumbent upon respondent to bring the instant suit; it might have waited and urged abandonment as a defense to an action by appellant. Passage of time should in no way prevent the clearing of the cloud on respondent's title. ▮ In particular, the *Secret Valley* case states that payment of taxes by a defendant in a quiet title action does not alter the above result as one may not acquire title by paying taxes; as also, one may not retain a title subject to abandonment merely by paying taxes.

▮ 41 California Jurisprudence 2d, page 495 et seq., states that passage of time *alone* will not constitute laches in a quiet title action.

Although appellant points out certain acts which it claims constitute a recognition by respondent of appellant's title and notes certain expenditures which it alleges constitute "reliance," the trial court weighed this evidence and found no laches. In particular, the evidence relating to intended "reconstruction" was such that the trial court could well have considered it to be a mere pretense.

Considering the holding in the *Secret Valley* case, *supra*, 187 Cal. 420, 425, and the fact that the trial court expressly found an absence of laches, waiver or estoppel, appellant is not entitled to reversal on any such ground.

HAS PLAINTIFF FAILED TO ESTABLISH ITS OWN TITLE BY NOT TRACING IT BEYOND THE SPRING VALLEY GRANT?

▮ Both appellant and respondent traced their title back to the Spring Valley Water Company and neither produced evidence showing the derivation of the water company's title. Appellant argues that as respondent must succeed on the strength of its own title and not on the weakness of appellant's, the proof is insufficient to justify the judgment. ▮ This argument ignores two vital factors: first, appellant claims title through Spring Valley Water Company and therefore may not attack its predecessor's title (*Roberts* v.

*Lebrain,* 113 Cal.App.2d 712, 714 [248 P.2d 810]) ; the title of both parties depends equally upon the validity of the Spring Valley title; neither party may attack the other's title on this basis; secondly, respondent, without showing any paper title, may recover as against appellant, as it is in possession of the servient tenement, under color of title, and therefore has a right as against all the world, except one who is able to show a superior right. Therefore, respondent is succeeding by virtue of the strength of its own title. Code of Civil Procedure, section 738, relied upon by appellant, has been construed to provide that a quiet title action may be brought by any person who has a right to possession. (*Pennie* v. *Hildreth,* 81 Cal. 127, 130 [22 P. 398].)

The title of Spring Valley is not actually denied by appellant, and such title has been recognized in prior litigation involving Ocean Shore and Spring Valley. (*Ocean Shore R. R. Co.* v. *Spring Valley Water Co., supra,* 87 Cal.App. 188.) As respondent is in privity with its predecessor in interest, the doctrine of res judicata should establish that at the time of the Hudner trial Spring Valley did have a good title, subject to the easement which has since been abandoned; if Spring Valley did not have good title, the court could not have declared then that Ocean Shore held a valid easement. Appellant cannot attack the title of the party through which it claims, and respondent, as possessor, has shown a better title.

Summarizing, the Selah Chamberlain Associates were not indispensable parties to the litigation, and the trial court had the discretion not to order their joinder; the rights of the Selah Chamberlain Associates, or their survivors or successors, are not determined by this litigation; Ocean Shore Railroad Company was not a trustee for the Selah Chamberlain Associates, but the vendor in an uncompleted sale of real property; there was ample evidence of the intention of the railroad company to abandon the right of way under evidence identical with that in the *Doelger* case and additional evidence received in the instant trial and the court was justified in making its findings accordingly; the constitutional rights of the appellant are not involved; there was no bar by laches, waiver or estoppel; the doctrine of res judicata does not prevent the judgment quieting the title of plaintiff; and there was ample evidence to sustain the trial court's finding that

plaintiff has sufficiently established its title as against the appellant.

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 26, 1962.