[No. S007919. Mar. 19, 1990.]

NAPA VALLEY WINE TRAIN, INC., Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CITY OF ST. HELENA et al., Real Parties in Interest.

**COUNSEL**

Heller, Ehrman, White & McAuliffe, Douglas P. Ley, Peter H. Goldsmith, Christopher M. Patti and Victor D. Ryerson for Petitioner.

Janice E. Kerr, Michael B. Day and Gretchen T. Dumas for Respondent.

Meyers, Nave, Riback & West, Michael S. Riback and Michael F. Rodriguez for Real Parties in Interest.

**OPINION**

**PANELLI, J.—**

## I. INTRODUCTION

In this case we consider whether the California Environmental Quality Act (Pub. Resources Code, §§ 21000 to 21177) (hereafter CEQA)[1] applies to a plan by the Napa Valley Wine Train, Inc. (Wine Train), to carry passengers on an existing 21-mile railroad line through California's Napa Valley. Believing that CEQA does apply, the Public Utilities Commission (PUC) ordered Wine Train not to begin passenger service until after submitting to an environmental review process. We hold, however, in accordance with an express statutory exemption, that CEQA does not apply to the institution of passenger service on rail rights-of-way already in use.[2] (§ 21080, subd. (b)(11) [hereafter the passenger-service exemption].)

---

[1] All further statutory citations, unless otherwise noted, are to the Public Resources Code.

[2] This case also touches on a jurisdictional conflict between the PUC and the federal Interstate Commerce Commission (ICC). Both the ICC and the PUC have asserted jurisdiction over Wine Train's passenger service. At the time this opinion is filed, the ICC is reconsidering its decision.

To resolve this case, however, we need not resolve the jurisdictional conflict. Even if the PUC had the power to regulate Wine Train's passenger service, the passenger-service exemption would nevertheless make CEQA inapplicable. Nor is there any other reason for us to resolve the jurisdictional conflict at this time. Although the parties' briefs suggest that the PUC may someday attempt to regulate other aspects of Wine Train's activities, such as franchis-

## II. Background

This case involves a railroad line in California's Napa Valley, an increasingly popular destination for tourists who come to visit the many wineries along State Highway 29. Starting at the valley's southern end in Rocktram, the line travels 21 miles north to Krug, roughly paralleling the highway. Wine Train plans to offer tourists an alternative to driving, operating as many as six trains daily and stopping at wineries along the way.

The railroad was first built over a century ago to carry tourists who arrived in ferries from San Francisco to the mineral baths in Calistoga. For most of its history, the line belonged to the Southern Pacific Transportation Company (SP). According to the parties, SP stopped transporting passengers on the line about 50 years ago. Transportation of freight, primarily wine from the area's vintners, continued but declined over time.[3]

In 1985, SP applied to the ICC for permission to abandon the line between Rocktram and Krug. However, Wine Train offered to purchase the line from SP later that same year. Because of Wine Train's offer, the ICC never granted SP's application to abandon. Under federal law, when "a carrier and a person offering to purchase a line enter into an agreement which will provide continued rail service" the ICC must dismiss the application to abandon and approve the proposed transaction. (49 U.S.C. § 10905(e).)[4] Acting under this statute the ICC dismissed SP's application to abandon and approved Wine Train's offer. The parties transferred ownership of the line in April 1987.

While its application to abandon was pending, SP stopped carrying freight on the line. SP's last delivery took place around the beginning of 1985. In purchasing the line, however, Wine Train became successor in interest to SP's license to operate and, as such, assumed federal statutory obligations not to discontinue service.[5] Accordingly, Wine Train reinstituted

ing, scheduling, and pricing, no such order is currently before us. To date, the PUC has used its asserted power over Wine Train only to order compliance with CEQA.

[3] According to the ICC, the Rocktram-Krug line handled 285 cars in 1982 and 269 cars in 1983. Traffic declined to 58 cars in the first 6 months of 1984. (Napa Valley Wine Train, Inc., Petition for Declaratory Order (1988) 4 I.C.C.2d 720 [hereafter ICC Decision].) Although SP continued to carry freight until approximately the beginning of 1985, the record does not disclose the precise volume of traffic after the first six months of 1984.

[4] In this statute and others, federal law expresses a strong policy in favor of the "continuation of a sound rail transportation system . . . ." (49 U.S.C. § 10101a(4).)

[5] Under 49 United States Code section 10905(f)(4), "[n]o purchaser of a line or portion of line sold under this section may transfer or discontinue service on such line prior to the end of the second year after consummation of the sale . . . ." Since transfer of ownership took

freight service on January 10, 1988, bringing two carloads of furniture from Utah and Illinois to a vintner in the Napa Valley. Later, in early February, the train carried six carloads of wine vats to another vintner.

These freight shipments evoked relatively little interest. Real parties have not asked the PUC to halt them. Wine Train's plan to institute passenger service, however, brought a storm of protest from residents of the Napa Valley, who feared that the train would bring additional tourists to their community. Local newspapers reported the debate. Opponents of the train feared that it would make the Napa Valley "an amusement park." Proponents argued that it would alleviate traffic congestion caused by tourists on State Highway 29.

On March 7, 1988, several Napa Valley cities and towns, the Napa Valley Vintners Association, and other interested persons (collectively real parties) filed a complaint with the PUC. In their complaint, real parties claimed that Wine Train was subject to the provisions of CEQA and that its proposed passenger service was subject to the PUC's regulatory jurisdiction. Real parties requested an order instituting investigation, "an order asserting the [PUC's] jurisdiction over [Wine Train's] passenger train service operations,"[6] and "an order requiring [Wine Train] to cease and desist from its operations until all environmental review and analysis of [Wine Train's] proposed 'project' as required by CEQA and [the PUC's rules] has occurred."

On April 13, 1988, the PUC issued an order directing Wine Train "to show cause why it should not be required to submit to the jurisdiction of [the PUC] with respect to the proposed operation of a passenger train service . . . ." At that time, however, the ICC was already considering a petition by Wine Train for an order declaring that its operations were not subject to the PUC's jurisdiction.

The PUC appeared in the ICC proceeding but also continued to claim jurisdiction for itself. Ultimately, the federal and state agencies issued

---

place in April 1987, this statute obliged Wine Train to provide service on request until at least April 1989. Under 49 United States Code section 11101(a), "[a] common carrier providing transportation or service subject to the jurisdiction of the [ICC] . . . shall provide the transportation or service on reasonable request." The PUC concedes that the ICC has jurisdiction over Wine Train's freight transportation.

[6] Real parties' reason for asking the PUC to assert jurisdiction was to fulfill a statutory predicate for ordering Wine Train to comply with CEQA. Although section 21065 sets out a broad definition of "project," no statutory provision makes CEQA's substantive provisions applicable to a private project unless the project is to be "approved by [a] public agenc[y]." (§ 21080, subd. (a).)

conflicting orders on the same day, July 8, 1988. The ICC held that Wine Train was "immun[e] from [the PUC's] jurisdiction over the franchising, scheduling and pricing of freight or passenger operations." (ICC Decision, *supra*, at p. 5.) Interpreting California law, the ICC also held that CEQA did not apply, "since [the PUC] has no power to regulate Wine Train's operations and thus has no decision making role here . . . ." (*Id.*, at pp. 5-6.) In direct contradiction, the PUC ordered that "[t]he rail passenger service proposed by [Wine Train] is subject to the jurisdiction of [the PUC]" and ordered Wine Train not to "institute any passenger service until it complies with all applicable requirements of [CEQA] . . . ." (*City of St. Helena* v. *Napa Valley Wine Train* (1988) 28 Cal.P.U.C.2d 352 (Dec. No. 88-07-019, p. 12) [hereafter PUC Decision].) After the PUC denied Wine Train's application for rehearing, we issued a writ of review.[7] (Pub. Util. Code, § 1756.)

## III. DISCUSSION

### *CEQA's Exemption for the Initiation of Passenger Service*

The fundamental purpose of CEQA is to promote "[t]he maintenance of a quality environment for the people of this state now and in the future . . . ." (§ 21000, subd. (a).) Since its enactment in 1970 we have acknowledged that the act's purpose is an important one. In *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], construing CEQA for the first time, we "conclude[d] that the Legislature intended [it] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Id.*, at p. 259.)

However, in the 19 years since CEQA was enacted the Legislature has, for reasons of policy, expressly exempted several categories of projects from environmental review. (See § 21080, subd. (b)(1-16).) This court does not sit in review of the Legislature's wisdom in balancing these policies against the goal of environmental protection because, no matter how important its original purpose, CEQA remains a legislative act, subject to legislative limitation and legislative amendment.

---

[7] After we granted review, Wine Train, the PUC, and real parties entered into a limited settlement agreement. Pursuant to the agreement, Wine Train has instituted limited passenger service and will prepare an environmental impact report on its institution of such service, whatever the outcome in this court. The settlement agreement does not make this case moot because the PUC, if CEQA applies, must conduct a full environmental review process, including, among other things, consideration of available measures to mitigate any environmental effects. (See § 21080.5, subd. (d)(2)(i).)

In 1978, the Legislature amended CEQA to include the predecessor of the exemption at issue here. As originally enacted, the exemption provided that "[a] project for the institution or increase of passenger or commuter service on rail lines already in use, including the modernization of existing stations and parking facilities, shall be exempt from [CEQA]." (Stats. 1978, ch. 791, § 1, pp. 2541-2542, formerly codified as § 21085.5.)[8]

In 1982, the Legislature amended the exemption by deleting the term "rail lines" and substituting "rail or highway *rights-of-way.*" (§ 21080, subd. (b)(11), as amended by Stats. 1982, ch. 1553, § 3, p. 6077, italics added.) The amendment was part of a bill that sought in various ways to further the transportation of passengers by rail. Most of the bill concerned a mechanism for financing rapid rail transit systems.[9] Since that time, the Legislature has repealed those CEQA exemptions that were specifically intended to facilitate rapid rail projects.[10] However, the passenger-service exemption (§ 21080, subd. (b)(11)), whose broader language exempts a wider variety of projects, has not been repealed and still is in force today.

■ In order to apply the passenger-service exemption in this case, we must first determine what it means for a right-of-way to be "already in use." If the Rocktram-Krug right-of-way is already in use, then CEQA does not apply to Wine Train's "initiation of passenger . . . services."[11] (§ 21080,

---

[8] In 1979, as part of a reorganization of CEQA, the Legislature repealed former section 21085.5 and reenacted it, after insignificant changes, as section 21080, subdivision (b)(11). (Stats. 1979, ch. 697, § 1, p. 2171.)

[9] (See Gov. Code, §§ 92000-92353, added by Stats. 1982, ch. 1553, § 2, p. 6061.)

[10] CEQA previously exempted projects "for the granting of an easement or franchise for the use of highway or street rights-of-way for high-speed intercity passenger rail purposes" and "for the granting of a certificate of public convenience and necessity for a railroad corporation whose primary business is the transportation of passengers . . . ." (Former § 21080, subd. (b)(17) & (18), added by Stats. 1982, ch. 1553, § 3, p. 6078, and deleted by Stats. 1985, ch. 392, § 2, p. 1567.)

[11] In his dissenting opinion Justice Kaufman argues that, even if the institution of passenger service is exempt from CEQA, Wine Train still must submit that project to the environmental review process because the PUC has power to regulate the safety aspects of railroad operation. (Dis. opn. of Kaufman, J., *post,* at pp. 394-397.) Justice Kaufman places particular emphasis on the PUC's power to regulate grade crossings and its duty to disburse federal funds for the construction of warning devices. Arguing that the construction of warning devices is part of the initiation of passenger service, Justice Kaufman concludes that a court should not "chop[ ] up" a project "into discrete activities for purposes of environmental assessment." (Dis. opn. of Kaufman, J., *post,* at p. 395.) The construction of warning devices enjoys a regulatory exemption from CEQA. (Cal. Code Regs., tit. 20, § 17.1, subd. (h)(1)(A)(7).) Justice Kaufman, however, dismisses the regulatory exemption with a citation to another regulation, which states that regulatory exemptions should not be applied when there is a reasonable

subd. (b)(11).) The PUC, noting that "freight service had not been performed for three years prior to February 1988," held that Wine Train was not entitled to the benefit of the exemption because "the rail right-of-way used by [Wine Train] was not already in use prior to its acquisition of the line from SP . . . ." (PUC Decision, *supra,* at p. 10.) This holding, which the PUC labeled a "finding of fact," in reality contains the implicit conclusion of law that the passenger-service exemption applies only when there has been uninterrupted rail traffic. In our view, the PUC misinterpreted the exemption, which refers to *"rights-of-way"* and not traffic statistics.[12] The existence of a railroad line on the Rocktram-Krug *right-of-way* suffices to demonstrate that the right-of-way is "already in use." (§ 21080, subd. (b)(11).)

We reach this conclusion based upon the Legislature's decision in 1982 to change the language of the passenger-service exemption from "rail lines" to "highway or rail *rights-of-way."* (§ 21080, subd. (b)(11), italics added.) The new language is substantially broader. A rail line is the arrangement of

possibility that the exempted activity will have a significant effect on the environment. (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).)

The flaw in these arguments is that they ignore the existence of the *statutory* passenger-service exemption (§ 21080, subd. (b)(11)), and the fact that the Legislature was obviously aware of the older railroad safety statutes at the time it enacted the exemption. The PUC's power over grade crossings, for example, dates back to 1911. (See Pub. Util. Code, § 1201, and its predecessor statutes at Stats. 1911, ch. 20, § 15, p. 18, and *id.,* ch. 386, § 1, p. 702.) The PUC's more general power to require safety devices dates back to 1915. (See Pub. Util. Code, § 768, and its predecessor statute at Stats. 1915, ch. 91, § 42, p. 137.) If general safety statutes like these, which are not even a part of CEQA, made CEQA applicable despite the specific statutory passenger-service exemption, then the exemption would be a nullity. Unlike the dissenters, however, we are not willing to assume that the Legislature has enacted a nullity or to substitute our own view of rail and environmental policy for the Legislature's. (Cf. dis. opn. of Mosk, J., *post, passim* [ignoring the statutory passenger-service exemption] and dis. opn. of Kaufman, J., *post, passim* [ignoring the exemption's legislative history].)

[12] Although the point is not determinative in this case, we note that the PUC also erred in assuming that the time at which the exemption operated was the date on which Wine Train acquired the line from SP—April 1987. Instead, the time at which the exemption logically operates is the time at which the responsible agency must determine whether or not to require the affected person to file an environmental impact report. Whether the PUC's first occasion to make such a determination was March 1988, when real parties filed a complaint claiming that Wine Train needed the PUC's permission to carry passengers, or in the fall of 1987, as Justice Kaufman argues in his dissenting opinion (dis. opn. of Kaufman, J., *post,* at pp. 397-399), it is clear that the right-of-way at issue was already in use at the relevant time.

Contrary to the suggestion in the dissent (dis. opn. of Kaufman, J., *post,* at p. 398), this case does not present the situation of an agency seeking early environmental review while a project proponent seeks to delay. In fact, the PUC's staff informed Wine Train by letter in *November 1984,* while Wine Train was negotiating the purchase of the Rocktram-Krug line from SP, that Wine Train would *not* need to apply for permission to conduct passenger service in the Napa Valley. The letter also noted that, "since no application is necessary, the California Environmental Quality Act . . . would not be automatically triggered" and no environmental assessment would be required.

facilities and equipment that makes rail transportation possible. A right-of-way is a real property right—the easement on which a line is built. (Civ. Code, §§ 801, 802.)[13] The effect of the passenger-service exemption, as amended, is to permit the institution or increase of passenger service on land already burdened by a highway or rail right-of-way—an easement for transportation purposes—so long as the right-of-way is already in use.

It is certain that the Legislature, in amending the passenger-service exemption, was using the term "right-of-way" in its technical, real property sense. In the same bill, the Legislature added to the Civil Code's chapter on "Servitudes" a section intended to describe the legal attributes of rights-of-way that have been granted to railroad corporations.[14] Moreover, if the Legislature had wanted the application of the exemption to turn on traffic statistics rather than on the status of rail "rights-of-way," there would have been no need to amend the language of the exemption to refer to such easements or to define them in the same bill.

Railroad tracks are relatively durable things. Once a railroad company has made use of its right-of-way by constructing a line, it ordinarily makes sense to assume that the land is permanently dedicated to transportation. For this reason, courts have refused to hold that rail rights-of-way have been lost simply because rail traffic has temporarily lapsed. "A right of way or easement granted to a railroad ' " "is not that spoken of in the old law books, but is peculiar to the use of a railroad which is usually a permanent improvement, a perpetual highway of travel and commerce, and will rarely be abandoned by non-user. . . . [¶] The right acquired by the railroad company, though technically an easement, yet requires for its enjoyment a use of the land permanent in its nature and practically exclusive.' [Citation.]" ' " (*Cash* v. *Southern Pacific R.R. Co.* (1981) 123 Cal.App.3d 974, 978 [177 Cal.Rptr. 474], quoting from *San Gabriel* v. *Pacific Elec. Ry. Co.* (1933) 129 Cal.App. 460, 464-465 [18 P.2d 996].) More specifically, it has been held as a matter of law that a railroad right-of-way is not destroyed by the discontinuance of passenger service and the continuation of desultory freight service on an "on call" basis. (*Tamalpais etc. Co.* v. *N.W. Pac. R.R. Co.* (1946) 73 Cal.App.2d 917, 924-927 [167 P.2d 825]; *Faus* v.

---

[13] Under Civil Code section 801, "[t]he following land burdens, or servitudes upon land, may be attached to other land as incidents or appurtenances, and are then called easements: . . . 4. The right of way . . . ." Similarly, under Civil Code section 802, "[t]he following land burdens, or servitudes, may be granted and held, though not attached to land: . . . [¶] Five. The right of way.[ ]"

[14] Under Civil Code section 801.7, subdivision (a), "[w]hen a right-of-way is granted pursuant to Section 801 or 802 to a railroad corporation whose primary business is the transportation of passengers, the grant shall include, but not be limited to, a right-of-way for the location, construction, and maintenance of the railroad corporation's necessary works and for every necessary adjunct thereto." (Added by Stats. 1982, ch. 1553, § 1, p. 6061.)

*City of Los Angeles* (1967) 67 Cal.2d 350, 360 [62 Cal.Rptr. 193, 431 P.2d 849].) Although a railroad's tearing up of its tracks may raise a question of fact about the destruction of its right-of-way, a decrease in traffic or a change from passenger to freight service does not. (73 Cal.App.2d at p. 927.)

Thus, real property law preserves a rail right-of-way from destruction so long as it has been put into use by the construction of a rail line, and so long as the operator has not intentionally abandoned it.[15] ▮▮▮ Because such a right-of-way also amounts to a disruption of the natural environment, the Legislature could reasonably have decided that any additional disruption due to the institution of passenger service was acceptable without further environmental review. Policy choices such as this are for the Legislature, not the courts. Accordingly, because the Rocktram-Krug right-of-way was put into use over a century ago by the construction of a rail line that still exists today, we hold the right-of-way is sufficiently "in use" for the purpose of section 21080, subdivision (b)(11).[16]

---

[15] The circumstances of this case show that such a rule is realistic: The ICC's decision to approve the sale of the Rocktram-Krug line, and the buyer's federal statutory obligation to continue service (see fn. 5, *ante*), made it likely that rail traffic would eventually resume.

The PUC and real parties argue, based on one of the PUC's findings, that the Rocktram-Krug right-of-way was not in use because the tracks "could not be used without first effecting substantial repairs and construction." (PUC Decision, *supra*, at p. 10.) Justice Kaufman embraces this argument in his dissenting opinion. (Dis. opn. of Kaufman, J., *post*, at p. 387, fn. 6.) The PUC's finding, however, does not show that the right-of-way was not in use. At most, the finding shows that there was a period of time during which trains were not running. The lapse in service might have been relevant under the former version of the passenger-service exemption, which, as we have discussed, could have been interpreted to require actual traffic on "rail lines." But the current version of the exemption pointedly refers to *"rights-of-way"* rather than lines. (§ 21080, subd. (b)(11).) As we have also discussed, a right-of-way is put into use by the construction of a line, and it endures until it is abandoned. None of the cases cited in Justice Kaufman's dissenting opinion holds to the contrary. (See dis. opn. of Kaufman, J., at pp. 389-391.)

Nor does the PUC's finding about the condition of the tracks demonstrate that the right-of-way had been abandoned. There was no abandonment in this case as a matter of law because the ICC never issued a certificate of abandonment. The ICC's "exclusive and plenary" jurisdiction to regulate abandonments completely preempts state law on the subject. (*Chicago & N.W. Tr. Co.* v. *Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317-323 [67 L.Ed.2d 258, 264-269, 101 S.Ct. 1124]; see also *Preseault* v. *Interstate Commerce Commission* (1990) 494 U.S. __, __ [108 L.Ed.2d 1, 11, 110 S.Ct. 914].) Accordingly, if Wine Train's efforts to refurbish the equipment it purchased from SP are relevant at all to the case before us, it is only because those efforts emphasize that Wine Train never intended to abandon.

[16] Justice Kaufman correctly recognizes in his dissenting opinion that real property cases distinguish between "nonuse" and "abandonment." (Dis. opn. of Kaufman, J., *post*, at pp. 389-391.) However, we cannot agree with Justice Kaufman's further suggestion that these cases provide a definition of "use" that is applicable to the passenger-service exemption.

As we have already discussed, the real property cases do have a limited relevance to this case. The unusual permanence of a rail right-of-way under real property law, once put into use by the construction of a line, makes such a right-of-way a lasting disruption of the

In opposition to this conclusion, the PUC and real parties argue that the Legislature's substitution of the term "right-of-way" had no significance. They do not, however, purport to find any support for their argument in the language or the legislative history of the statute. Rather, the PUC and real parties in effect challenge the Legislature's wisdom. They urge us, in order to avoid the possibility of significant environmental effects, to read the statute to require "continuous" or "substantial" rail traffic before passenger service can be added.[17] However, "[i]n construing the statutory provisions a court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language." (*People* v. *One 1940 Ford V-8 Coupe* (1950) 36 Cal.2d 471, 475 [224 P.2d 677]; see also *Burnsed* v. *State Bd. of Control* (1987) 189 Cal.App.3d 213, 217 [234 Cal.Rptr. 316].) Moreover, it defeats the very purpose of the exemption to apply it only to projects that will have no significant environmental effects. The determination that "a project may have a significant effect on the environment" is the finding that, absent an exemption, ordinarily triggers the environmental review process. (§ 21082.2, subd. (a).) It is precisely to avoid that burden for an entire class of projects that the Legislature has enacted the exemption.

The PUC and real parties defend their artificially narrow interpretation of the passenger-service exemption as necessary to achieve harmony with CEQA's broad environmental goals. However, we do violence to the Legislature's intent if the so-called harmony can be achieved only by rewriting the statute. Nor is it necessarily correct, in any event, to assume that a harmony must exist between CEQA's general purpose and the purposes of each of its statutory exemptions. The exemptions reflect a variety of policy goals. Perhaps some, like the exemption for thermal power plants (§ 21080,

environment. Thus, the Legislature could reasonably have decided that any additional disruption due to the institution of passenger service was acceptable without further environmental review. However, the dissenting opinion makes too much of the real property cases when it assumes that the authoring courts were using the word "use" in the same sense that the Legislature would use it many years later. Unlike the term "right-of-way," which has always been a term of art, and which the Civil Code has expressly defined since 1872, "use" is not a term of art, it is not defined by statute, and its meaning thus varies with the context. We should not import an undefined term from one area of the law to another without inquiring how the context has changed.

[17]The record, as already discussed, shows that SP carried freight on the line for many years, ending approximately at the beginning of 1985, and that Wine Train resumed freight shipments in January 1988. The PUC and real parties dismiss this traffic as "sporadic." Justice Kaufman, who makes the similar argument that "use" under the passenger-service exemption means actual rail traffic (dis. opn. of Kaufman, J., *post,* at pp. 389-391), dismisses this evidence as not constituting "use" at all. Although the point is not determinative, we find it impossible to characterize over a century of railroad operations, with barely a three-year interruption, as anything other than actual and substantial rail traffic.

subd. (b)(6)), reflect long-term environmental strategy. Others, however, like the exemption for hosting the Olympic Games (subd. (b)(7)), are designed to further the state's financial interests and other nonenvironmental goals. The exemption for passenger service (subd. (b)(11)) may reflect elements of environmental strategy,[18] but it may also reflect a desire simply to preserve the rail transportation system. As a practical matter, the statutory exemptions have in common only this: the *Legislature* determined that each promoted an interest important enough to justify forgoing the benefits of environmental review.

■ ■ ■ ■ Legislative committee analyses of Senate Bill No. 1894, which became the passenger-service exemption, show that the Legislature deliberately weighed the benefit of increased passenger service against the risk of forgoing environmental review under CEQA.[19] (Sen. Bill No. 1894 (1977-1978 Reg. Sess.).) The Senate Committee on Public Utilities, Transportation and Energy, in its analysis of the bill, summarized debate on the proposed passenger-service exemption this way: "Proponents argue that the reluctance of railways to improve passenger service requires the State to make extraordinary effort to realize any progress at all. The cost, in time and legal fees, can be reduced if . . . improvements in passenger and commuter rail service on existing lines are exempted statutorily from [environmental impact report] requirements . . . . Opponents feel the State should not be allowed additional powers to overcome the objections to increased passenger rail service because delays in improving service result in more careful consideration of the broader effects and costs of improvement." (Sen. Com. on Public Utilities, Transportation & Energy, Analysis of Sen. Bill No. 1894 (1977-1978 Reg. Sess.) p. 3.) Similarly, the Senate Ways and Means Committee identified the issue presented as "whether it is good policy to exempt certain classes of activities from provisions of CEQA . . . ." (Sen. Ways & Means Com., Staff Analysis of Sen. Bill No. 1894 (1977-1978 Reg. Sess.) p. 1.) These stark presentations of the choice the Legislature faced leave no doubt that the Legislature understood the consequences of exempting a class of projects from environmental review and intended to do so.

We need not dwell on three additional interpretations of the exemption that real parties have proposed. Each disregards an important part of the

---

[18] For example, the exemption may reflect a desire to divert travelers from automobiles to passenger trains, thereby reducing exhaust emissions.

[19] We have said with respect to committee materials that "[i]t is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it." (*Hutnick v. United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326].)

statutory language. First, real parties argue that the exemption applies only if the right-of-way is already in use for passenger service, as opposed to freight. But this argument reads out of the statute the Legislature's express reference to the "institution" of passenger service. (§ 21080, subd. (b)(11).) ■ Both logic and respect for the limits of judicial power require us to give "[s]ignificance . . . 'to every word, phrase, sentence and part of an act.'" (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315], quoting *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 638 [268 P.2d 723].) ■ Moreover, as already discussed, application of the exemption does not require any particular type or level of rail traffic so long as the right-of-way is already in use.

Second, opposed to a possible influx of tourists, real parties argue that the exemption applies only to "commuter" services. To the contrary, the exemption expressly applies to "passenger *or* commuter services." (§ 21080, subd. (b)(11), italics added.) Clearly, passengers can include tourists.

Finally, noting that Senate Bill No. 1894 also reappropriated funds to improve the Los Angeles-San Diego rail corridor, real parties argue that the Legislature had only that one project in mind. The uncodified reappropriation provision, however, is completely separate from the passenger-service exemption and clearly refers to a particular project.[20] In contrast, the language of the exemption provision does not refer to any particular project. The provision declares generally that CEQA "shall not apply to the following: . . . (11) [a] project for the institution or increase of passenger or commuter services . . . ." (§ 21080, subd. (b)(11).)

Accordingly, we hold that section 21080, subdivision (b)(11), exempts Wine Train's institution of passenger service on the Rocktram-Krug line from the requirements of CEQA. The PUC's order, which is predicated on an erroneous interpretation of the statute, is contrary to law. Accordingly, the PUC has not "regularly pursued its authority."[21] (Pub. Util. Code, § 1757.)

---

[20] The text of the reappropriation provision, which has nothing at all to do with CEQA, appears at Statutes 1978, chapter 791, section 3, page 2542. It provides that "[a]ll funds appropriated [by a previous act] . . . are hereby reappropriated . . . for (a) the improvement of the railroad tracks and passenger facilities . . . between Los Angeles and San Diego, and (b) the purchase of rights-of-way and the realignment of that portion of the line between San Juan Capistrano and San Clemente, so that trains may operate safely on the line at a speed of 110 miles per hour."

Lest there be any doubt that the passenger-service exemption does not apply only to the Los Angeles-San Diego corridor, we note that the later bill reenacting the exemption did not even refer to that project. (Assem. Bill No. 1534 (1979-1980 Reg. Sess.); Stats. 1979, ch. 697, § 1, pp. 2172-2173, codified at Pub. Resources Code, § 21080.)

[21] We do not hold that every action Wine Train might undertake as an entity is necessarily exempt from CEQA. Subdivision (b)(11), on which we rely, expressly exempts only the

## IV. DISPOSITION

The decision of the Public Utilities Commission is annulled.

Lucas, C. J., Eagleson, J., and Kennard, J., concurred.

**MOSK, J.**—I dissent, and in doing so join the well-reasoned, indeed irrefutable, opinion of Justice Kaufman.

I write separately merely to express incredulity that the judiciary would undertake to interfere with the manifest duty of the appropriate administrative agency as that duty is mandated by the Legislature. It is paradoxical that this court, which should be insisting on strict compliance with environmental requirements, abjectly stamps its approval on a total evasion of societal protection.

We should keep in mind the animating purpose of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). In a broad declaration of policy, the Legislature found that "[t]he maintenance of a quality environment for the people of this state now and in the future is a matter of statewide concern." (*Id.*, § 21000, subd. (a).) It declared, "It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage . . . ." (*Id.*, § 21000, subd. (g).) Consistent with these broad objectives, we have held that CEQA must "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

The Public Utilities Commission (hereafter PUC) has appeared to faithfully fulfill the responsibility imposed upon it as an agency of state government which has regulatory functions. There is a strong presumption favoring the validity of a PUC order. (*Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 537 [149 Cal.Rptr. 692, 585 P.2d 491].) Indeed, by statutory command, the scope of our review of a PUC decision is limited; it "shall not be extended further than to determine whether the commission has regularly pursued its authority, including a

---

"institution or increase of passenger services" and the "modernization of existing stations and parking facilities." (§ 21080, subd. (b)(11).)

Real parties have expressed concern over CEQA's application to local projects, including construction, in the Napa Valley. No such question is before us.

determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State." (Pub. Util. Code, § 1757; *City and County of San Francisco* v. *Public Utilities Com.* (1985) 39 Cal.3d 523, 530 [217 Cal.Rptr. 43, 703 P.2d 381].) In general, therefore, if commission findings are supported by any evidence, they may not be set aside. (*Yucaipa Water Co. No. 1* v. *Public Utilities Com.* (1960) 54 Cal.2d 823, 828 [9 Cal.Rptr. 239, 357 P.2d 295]; see also 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 913, pp. 463-464.) There is ample evidence in this case.

Nearly two decades ago this court made it clear in *Friends of Mammoth, supra,* that we "will not countenance abuse" of the requirements of CEQA, particularly "in view of the clearly expressed legislative intent to preserve and enhance the quality of the environment." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 271.) We also emphasized that an environmental impact report is mandated not only when a proposed project *will* have a significant environmental effect, but also when it *may* or *could* have such an effect.

The majority have in effect turned the clock back to pre-CEQA anything-goes days. Only the future will reveal the impact on and damage to the sensitive environment of the Napa Valley that their unfortunate opinion may cause.

Broussard, J., concurred.

KAUFMAN, J.,*Dissenting.—In proceedings initiated by a broad-based coalition of local businesses and public agencies, the California Public Utilities Commission (PUC) ordered petitioner Napa Valley Wine Train, Inc. (Wine Train) to refrain from instituting passenger service on its Napa Valley railroad line until the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) had been satisfied.[1] We are asked to determine whether the PUC "regularly pursued its authority" (Pub. Util. Code, § 1757) in so ordering. As explained below, I believe the facts and the law compel affirmance of the PUC decision.

INTRODUCTION

At the outset, it may be useful to explain what this case is *not* about. Whether justified or not, CEQA complaints have come to be viewed by

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

some as a tool for obstruction and delay wielded by individuals concerned more with their own narrow interests than with the public good. *That is not this case.* Real parties in interest—the Cities of Napa and St. Helena, the Town of Yountville, the County of Napa, and the Napa Valley Vintners Association, a nonprofit trade association consisting of over 100 wineries in the Napa Valley—represent a broad coalition of public and private interests throughout the region.

Nor is this a case of obstruction for obstruction's sake. The record shows that neither real parties nor the PUC has ever opposed Wine Train's effort to establish a tourist-oriented passenger line in the Napa Valley.[2] They have merely sought, at first informally and when that failed through a complaint with the PUC, to learn through the appropriate review process the effect that 500,000 annual passengers, 5 daily round-trip trains, several new passenger stations, shuttle buses, sirens, and over 100 public and private railroad crossings might have on the local environment. That is not, in my view, an unreasonable request.

Ultimately, of course, our decision must rest not on what appears "reasonable" but on the law—in this case, as explained below, on the relatively complex interaction of provisions of CEQA, the Public Utilities Code, the Federal Rail Safety Act and the Staggers Rail Act of 1980. In construing these various enactments, however, it is not inappropriate, I think, to recall Mr. Bumble's famous retort: "If the law supposes that," he said, "the law is a ass . . . ."[3] If there is a principled way in this matter to avoid Mr. Bumble's colorful description, as I believe there clearly is, then by all means let us seize it.

## I. Background

The railroad line in question traverses the Napa Valley from its southern end in Rocktram to Krug, 21 miles north. Roughly paralleling State Highway 29, the line passes through or near the Cities of Napa and St. Helena and the Town of Yountville.

For most of its history, the century-old Rocktram-Krug line was owned by Southern Pacific Transportation Company (Southern Pacific). Southern Pacific ended passenger service on the line over 50 years ago. Freight service

---

[2] The record contains, for example, conciliatory letters to Wine Train from real party City of St. Helena underscoring that city's "desire to have a mutually beneficial relationship with the Wine Train," and a similar communique from the Town of Yountville indicating its desire for a "cordial and mutually beneficial relationship with Wine Train."

[3] Charles Dickens, Oliver Twist.

continued but declined over time, dwindling to several hundred cars in 1982 and 1983, and 58 cars in the first 6 months of 1984. The parties agree that rail traffic on the line ceased sometime toward the end of 1984 or early 1985.

In 1985, Southern Pacific applied to the Interstate Commerce Commission (ICC) for permission to abandon the Rocktram-Krug line. In mid-October of that year, the ICC authorized the abandonment.[4] Thereafter, however, Wine Train offered to purchase the line and agreed to provide rail service. Accordingly, as required by federal law,[5] the ICC dismissed the application to abandon and approved Wine Train's offer. The parties transferred ownership in April 1987.

Wine Train proceeded to effect substantial repairs and refurbishing of the line that were necessary to make it operable.[6] It also began to formulate and publicize its plans. As noted, these included five daily round-trip trains including a "dinner train," passenger stations at six points along the route, plus shuttle buses to transport passengers to nearby wineries. The proposal called for 110 private and public crossings, including crossings over State Highway 29 and a number of winery driveways, many of which required grading, alteration and refurbishing. When fully operable, it was estimated the trains would emit over 4,000 whistle blasts a day.

In September and October of 1987, during this period of repair, the PUC informed Wine Train that it was subject to PUC regulation and general orders concerning various safety features of its operation, that the PUC would be acting as the "lead agency" for CEQA purposes (§ 21067), and that Wine Train would be required to submit an initial assessment of the possible environmental effects of its operations. During this same time period, Wine Train was attempting to obtain financial reimbursement through the PUC in connection with its alteration and maintenance of crossing warning devices. In response to the PUC's letters, Wine Train asserted that

---

[4] The majority states that the ICC "never granted SP's application to abandon." (Maj. opn., *ante*, at p. 374.) In fact, the ICC formally authorized abandonment of the line in October 1985, but as a result of Wine Train's intervening offer to purchase no certificate of abandonment was ever issued.

[5] (49 U.S.C. § 10905(e).)

[6] The PUC made a finding of fact that the Rocktram-Krug line "could not be used [by Wine Train] without first effecting substantial repairs and construction." At oral argument, counsel for Wine Train acknowledged that it had made considerable efforts "to refurbish the line to enable Wine Train to be able to operate passenger service upon it," and further stated that in February 1988, "upon the completion of the refurbishment of the track, the Wine Train . . . commenced freight operations on that line." Counsel further acknowledged, "There was a period of time [late 1984 or early 1985 to February 1988] during which freight was not going over the line because of the fact it had to be refurbished . . . ."

the Staggers Rail Act of 1980 (Staggers Act) (Pub.L. No. 96-448, 94 Stat. 1895 (codified in various sections of 49 U.S.C.)) preempted state authority,[7] and further claimed that its initiation of passenger service was exempt from CEQA review under section 21080, subdivision (b)(11).[8] In late October 1987, Wine Train filed a petition with the ICC seeking a declaratory order to that effect.

Also during this time, real parties were becoming concerned about the potential traffic, safety, air and noise pollution and other potential effects on the local environment posed by the Wine Train proposal. On March 7, 1988, real parties filed a complaint with the PUC seeking an order restraining Wine Train from instituting service until it had submitted to the CEQA review process.

On July 8, 1988, both administrative bodies handed down their decisions. The ICC, with two commissioners dissenting, agreed with Wine Train that the PUC "has no power to regulate Wine Train's operations" and thus no authority to compel CEQA review. (Napa Valley Wine Train, Inc., Petition for Declaratory Order (1988) 4 I.C.C.2d 720.) The PUC ruled that Wine Train was subject to PUC jurisdiction, that it was a "project" within the scope of CEQA (§ 21065), and that it was not exempt from CEQA compliance under section 21081, subdivision (b)(11) inasmuch as the line was not "already in use."

We granted Wine Train's petition for review of the PUC decision.

## II. DISCUSSION

Wine Train contends the PUC erred in determining (1) that the PUC had jurisdiction over its operations; (2) that Wine Train constituted a "project" under CEQA; and (3) that Wine Train was not exempt from CEQA review pursuant to section 21080, subdivision (b)(11). As will appear in the

---

[7] The Staggers Act provides that a "state authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the commission under subchapter I of chapter 105 of this title if such state authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle." (49 U.S.C. § 11501(b)(1).)

The statute provides that a state can continue to regulate intrastate rail transportation only if it receives a federal certification that it will administer the regulatory standards of the ICC. (49 U.S.C. § 11501(b)(2).) California is not certified under 49 United States Code section 11501.

[8] That section exempts from CEQA review, "A project for the institution or increase of passenger or commuter services on rail or highway rights-of-way already in use, including modernization of existing stations and parking facilities." (§ 21080, subd. (b)(11).)

discussion that follows, these contentions present closely interrelated questions of law that, in my view, are most logically addressed in the following order: First, what is the meaning of a right-of-way "already in use" under the statutory exemption; second, does Wine Train constitute a "project" subject to PUC jurisdiction; third, what was the appropriate time for the PUC to compel an environmental review of Wine Train; and, finally, was the right-of-way "already in use" when the PUC exerted its jurisdiction to compel CEQA compliance?

### A. The Meaning of "In Use"

The majority opinion concludes that the railroad right-of-way in question was "already in use" when the PUC was first authorized to assess Wine Train's environmental impact, and therefore that Wine Train was exempt from CEQA review under section 21080, subdivision (b)(11).[9] Noting that the original statutory language was amended in 1982 to substitute "rail rights-of-way" for the former phrase "rail lines," the majority opinion deems it "certain that the Legislature, in amending [subdivision (b)(11)], was using the term 'right-of-way' in its technical, real property sense." (Maj. opn., *ante,* at p. 379.) With that in mind, the majority proceeds to analyze the statutory language, citing several venerable cases for the proposition that a railroad right-of-way is not "destroyed" (*Tamalpais etc. Co.* v. *N.W. Pac. R.R. Co.* (1946) 73 Cal.App.2d 917, 924-927 [167 P.2d 825]) or "lost" (*San Gabriel* v. *Pacific Elec. Ry. Co.* (1933) 129 Cal.App. 460, 464-465 [18 P.2d 996]) merely when rail traffic has temporarily lapsed. (Maj. opn., *ante,* at pp. 379-380.) The legal proposition the majority opinion derives from these cases is stated as follows: "Thus, real property law preserves a rail right-of-way from destruction so long as it has been put into use by the construction of a rail line, and so long as the operator has not intentionally abandoned it." (Maj. opn., *ante,* at p. 380.) Applying this rule to the facts in the matter at hand, the majority opinion concludes: "The existence of a railroad line on the Rocktram-Krug right-of-way suffices to demonstrate that the right-of-way is 'already in use.'" (Maj. opn., *ante,* at p. 378, italics omitted.) The majority restates the same proposition elsewhere as follows: "[B]ecause the Rocktram-Krug right-of-way was put into use over a century ago by the construction of a rail line that still exists today, we hold the right-of-way is sufficiently 'in use' for the purpose of section 21080, subdivision (b)(11)." (Maj. opn., *ante,* at p. 380.)

The foregoing analysis and conclusion are demonstrably incorrect. It is apparent that the majority has confused principles relating to the *abandon-*

---

[9] Thus, the majority opinion essentially avoids, except in footnote remarks, any extensive discussion of the question whether Wine Train was a "project" subject to PUC jurisdiction.

*ment* or extinguishment of a railroad right-of-way with those relating to its *use*. Long-settled authority provides that nonuse *plus* an intent to abandon, as evidenced by such factors as an application for permission to abandon, lack of maintenance or the tearing up of tracks, may extinguish a railroad right-of-way. (*People* v. *Southern Pacific Co.* (1916) 172 Cal. 692, 700-701 [158 P. 177]; *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co.* (1962) 206 Cal.App.2d 421, 436-438 [23 Cal.Rptr. 881]; *Ocean Shore R.R. Co.* v. *Doelger* (1960) 179 Cal.App.2d 222, 231-232 [3 Cal.Rptr. 706].) Obviously, if nonuse *plus* the removal of tracks may constitute an abandonment of a railroad right-of-way, then nonuse cannot be the *equivalent* of the removal of tracks, and the opposite must be true as well; *the existence of tracks on a railroad right-of-way does not, ipso facto, mean that it is in use.* A sampling of case law illustrates the point.

*Home R.E. Co.* v. *Los Angeles Pac. Co.* (1912) 163 Cal. 710 [126 P. 972] is often cited for the fundamental rule noted above "that mere nonuser, not accompanied by an intent to abandon, will not divest the right of the railroad company to the easement." (*Id.* at p. 714.) The question in that case was whether defendant's predecessor in interest had abandoned a railroad right-of-way. The evidence showed that active operation of the railroad as a passenger line had ceased after 1897, and that only intermittent freight runs had occurred until 1899. Thereafter, though the tracks remained in place, they became covered in places with dirt and debris. The trial court held the right-of-way had been abandoned. This court affirmed, holding that the evidence was "sufficient to satisfy a trial court that [defendant] did not intend to again use the road for [rail] traffic." (*Id.* at p. 716.)

*Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, also involved an appeal from a trial court finding that the defendant railroad company had abandoned a former right-of-way. The evidence showed that the railroad operated until 1920, when it applied to the ICC for permission to abandon operations. The request was granted and thereafter the company removed its tracks and ties. The Court of Appeal affirmed, holding that there was ample evidence to support the judgment: "Appellant not only stopped *using* the right of way, it took up the tracks, allowed others to use the right of way and sold portions thereof in other areas . . . ." (*Id.* at p. 438, italics added.)

The distinction between nonuse of a railroad line and other indicia of an intent to abandon, such as the tearing up of tracks, is veritable hornbook law across the nation. (See, e.g., *Mammoth Cave National P. Ass'n.* v. *State Highway Com'n.* (1935) 261 Ky. 769 [88 S.W.2d 931, 935] ["The record clearly discloses that the railroad company, by abandoning the use of its

railroad, tearing up and removing its tracks, and attempting to convey the land to others . . . abandoned its right of way . . . ."]; 74 C.J.S., Railroads, § 117, pp. 541-543.)

As these and other decisions too numerous to adumbrate make clear, the notion that a right-of-way is "in use" so long as the rail line is in "existence" is simply incorrect. When the cases speak of "use" in connection with a railroad right-of-way, they clearly mean something distinct from the mere existence or nonexistence of tracks and ties; they mean the actual, regular operation of a railroad line.[10]

The majority opinion errs when it frames the question here as whether the right-of-way has been "lost" or "destroyed."[11] To be sure, the PUC finding relating to the inoperable condition of the tracks when Wine Train acquired the line, and the application to abandon operations by Wine Train's predecessor, Southern Pacific, might make the question of abandonment a close one. But that is not the issue here. The real question is more narrow: Was the Rocktram-Krug right-of-way "in use"? As demonstrated above, the answer to that question turns not on whether the line had been torn up and abandoned, but on whether it was actually serving trains in operation.

Before turning to the record to determine whether the line was in use, however, three predicate questions must be answered. First, in use when? The statute (§ 21080, subd. (b)(11)) exempts rights-of-way *already* in use." (Italics added.) To what point in time does "already" refer? On this point, we agree with the majority opinion that logically the exemption should be measured from "the time at which the responsible agency must determine

---

[10] The majority conspicuously fails to confront the numerous real property, rights-of-way cases that construe the term "use" to mean actual operation of a rail line. Rather, the majority asserts that "use" is a term with no precise common law content. (Maj. opn., *ante,* at p. 380, fn. 16.) The majority cannot, however, have it both ways. It cannot assume the Legislature intended to employ the term rights-of-way in its common law sense (maj. opn., *ante,* at p. 379) but conveniently deny that the Legislature intended the same meaning for "in use."

[11] As the majority does here, the cases frequently substitute such terms as "lost," "destroyed," "terminated" and "extinguished" for the more technical term "abandoned." (See, e.g., *City of Vallejo* v. *Scally* (1923) 192 Cal. 175, 177 [219 P. 63] ["The finding that the plaintiff had *abandoned* the right of way was erroneous. . . . [M]ere nonuser does not *destroy* an easement created by a deed of grant . . . . '[A]n easement founded upon a grant cannot be *lost* by mere nonuser . . . .' " (Italics added.)]; accord, *Gardner* v. *San Gabriel Valley Bank* (1907) 7 Cal.App. 106, 111 [93 P. 900] ["destroy the easement"]; *People* v. *Southern Pacific Co., supra,* 172 Cal. at p. 695 ["lost by abandonment"].)

At oral argument, Wine Train embraced the same mistaken notion as the majority, arguing that "in use" was the equivalent of "not abandoned." As noted above, neither the statutory language nor the case law supports such an interpretation.

whether or not to require the affected person to file an environmental impact report." (Maj. opn., *ante,* at p. 378, fn. 12.)

This raises a second question: When should the PUC's environmental review of Wine Train have occurred? And this question, in turn, raises still a third issue: Did the Wine Train proposal constitute a "project" within the meaning of CEQA so as to require any environmental assessment at all? I address the latter two questions, in reverse order, below. At the conclusion of that discussion, I shall return to the issue of "use" and the critical question whether the Rocktram-Krug line was "already in use" when the PUC requested an assessment of the potential environmental effects of the Wine Train proposal.

B. *Does Wine Train Constitute a CEQA "Project Subject to PUC Jurisdiction"?*

The answer to this question is undeniably yes. It is no exaggeration to say that the Wine Train proposal implicates every basic environmental concern that CEQA is designed to address. The plan as fully conceived contemplates, inter alia: the construction of depots, repair facilities and 6 different passenger stations along a 21-mile route that parallels State Highway 29 through the heart of the wine country; the running of 5 daily diesel-burning round-trip trains, including 1 evening "dinner" train, through one of the most sensitive agricultural regions in California; the carrying of upwards of 500,000 railroad passengers a year into the Napa Valley; the institution of bus and shuttle service between train stations and wineries; the grading, construction alteration and refurbishing of many of the 110 railroad crossings over both public and private property rights-of-way, including numerous winery driveways; the installation of guardrails, lights and other safety devices; and the intermittent blaring of train whistles an estimated 4,000 times per day.

While I do not purport to prejudge the result of any initial environmental assessment, it is safe to say that Wine Train may and very likely will have a significant effect on the environment, in areas ranging from air and noise pollution, to traffic volume and delays, particularly at street and highway crossings, to pedestrian and vehicular safety, particularly at train stops near wineries.

It is thus literally indisputable that Wine Train may have a significant effect on one of the most sensitive and cherished environmental resources in the state, the Napa Valley. It is equally undisputed that CEQA was enacted to "[e]nsure that the long-term protection of the environment . . . *shall be*

*the guiding criterion in public decisions"* (§ 21001, subd. (d), italics added), and therefore that "the Legislature intended [CEQA] to be interpreted in such manner as to afford the *fullest possible protection to the environment* within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], italics added; accord, *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 83 [118 Cal.Rptr. 34, 529 P.2d 66].) The conclusion is thus inescapable that Wine Train's operations must be held subject to the requirements of CEQA if the activities in question qualify as "projects" within the meaning of section 21065 (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 966 [131 Cal.Rptr. 172]) and are not otherwise exempt from review.

The Legislature and the courts have made it clear that the term "project" is to be defined broadly. In a seminal decision interpreting the scope of CEQA, this court defined " 'project' to mean . . . that before an environmental impact report becomes required the government must have some minimal link with the activity, either by direct proprietary interest or by permitting, regulating, or funding private activity." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at pp. 262-263.) The statute itself defines the term as meaning, inter alia: "(b) Activities . . . supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies," or "(c) [a]ctivities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065, subds. (b), (c).) In elaborating on the statutory definition, the Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) (CEQA Guidelines) stress that " '[p]roject' means the *whole of an action,* which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ." (CEQA Guidelines, § 15378, italics added.)

Wine Train contends the Staggers Act preempts state authority over intrastate railroad passenger lines. Therefore, it argues, the PUC lacks the minimal authoritative "link" with Wine Train's operations necessary to make the proposal a project subject to CEQA review. The argument is unpersuasive. Though the ICC ruled in favor of Wine Train on this question, that decision has been cast into considerable doubt by subsequent events. Chief among these is a federal appeals court decision limiting the scope of the Staggers Act to "exclusively ratemaking and related [economic] activities . . . rather than trackage abandonment and other noneconomic matters." (*Illinois Commerce Com'n* v. *I.C.C.* (D.C. Cir. 1989) 879 F.2d

917, 926.) The court also severely criticized an earlier ICC decision,[12] on which the ICC relied in this matter, that held the Staggers Act applies to passenger as well as freight service.

In light of the decision in *Illinois Commerce Com'n, supra,* the ICC has asked the federal appeals court to remand the record so that it may reconsider its decisions in this matter. These events strongly suggest the ICC will modify its earlier view that the Staggers Act preempts the PUC's authority over instrastate passenger lines such as Wine Train.

We need not, however, enter this particular jurisdictional fray. For even assuming arguendo that federal law preempts the PUC's franchising and related economic authority over Wine Train, the state nevertheless retains two independent sources of authority in this matter sufficient to compel CEQA compliance. The first of these lies in the area of public funding. As noted earlier, section 21065, subdivision (b) defines a project for purposes of CEQA review as "[a]ctivities . . . supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies." As also noted earlier, Wine Train has requested PUC reimbursement for funds expended in altering and maintaining crossing warning devices.

Wine Train does not deny that it has requested such public assistance. It contends, rather, that such assistance cannot constitute a "project" under the PUC's own rules, which define a categorical exemption from the environmental impact report (EIR) requirements of CEQA for the "[i]nstallation of new railroad-highway signals or signs . . . ." (Cal. Code Regs., tit. 20, rule 17.1, subd.(h)(1)(A)7; see also CEQA Guidelines, § 15300.4.) The majority opinion notes this categorical exemption, as well. (Maj. opn., *ante,* at p. 377, fn. 11.) What neither Wine Train nor the majority opinion acknowledges, however, is the fact that all state-agency defined categorical exemptions are subject to the overriding proviso that they shall *not* apply "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (CEQA Guidelines, § 15300.2, subd. (c).) Surely the transportation of nearly 500,000 passengers annually across 110 public and private railroad crossings, with the attendant effect of such crossings on pedestrian and vehicular safety, traffic and noise, constitutes "a significant effect on the environment due to unusual circumstances."[13]

---

[12] Mendocino Coast Railway, Inc., Discontinuance of Train Service in Mendocino County, California, ICC Docket No. 30820 (Nov. 12, 1986).

[13] The majority asserts that this exception, if applied here, could render section 21080, subdivision (b)(11), a "nullity." (Maj. opn., *ante,* at p. 378, fn. 11.) Not so. The exception applies

Wine Train nevertheless asserts that the financing of crossing warning devices cannot be used, in effect, to "bootstrap" the entire project into CEQA. Comprehensive environmental assessment based on partial financial assistance constitutes nothing of the kind. The Legislature and the courts have insisted that a project constitutes the "whole of an action" (CEQA Guidelines, § 15378; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp., supra,* 59 Cal.App.3d at p. 969), and have uniformly rejected the notion that a project may be "chopped up" into discrete activities for purposes of environmental assessment. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96].) Indeed, this court has definitively rejected "[t]he notion that the project itself must directly have . . . an effect" on the environment (*Bozung, supra,* 13 Cal.3d at p. 279); so long as it constitutes a step in a chain of events which would culminate in physical impact on the environment, an EIR will be required. (*Ibid.*; see also *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 795 [187 Cal.Rptr. 398, 654 P.2d 168]; *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 265.)

Wine Train, consequently, cannot argue that it does not constitute a CEQA project merely because the PUC's financial assistance applies only to a portion of its overall operations. And, as noted earlier, it is idle to argue that the particular activity in question—the construction and maintenance of crossing warning devices—may not culminate in physical change in the environment. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 281.) Accordingly, it is clear that under section 21065, subdivision (b) and the reasoning of *Friends of Mammoth* and *Bozung,* Wine Train constitutes a "project" within the scope of CEQA.[14]

---

*only* where the grade crossings pose a significant environmental effect due to "unusual circumstances." It does not apply to the usual upgrading or modification of grade crossings. Obviously this case, involving dozens of grade crossings throughout a particularly sensitive agricultural region, constitutes an "unusual circumstance."

[14] At oral argument Wine Train asserted for the first time that CEQA does not apply because the PUC's funding is simply a ministerial function, and therefore does not constitute a "discretionary project" within the meaning of section 21080, subdivision (a). Wine Train failed to raise this argument in the hearing before the PUC, and cited no authorities at oral argument before this court, notwithstanding the PUC's contention throughout these proceedings that its approval authority was discretionary. Nevertheless, I am satisfied that the PUC retains broad discretion under the law to determine the percentage of costs, if any, to be reimbursed to Wine Train for the construction and maintenance of grade crossings and warning devices. (See *Matter of California Dept. of Public Works* (1970) 71 Cal.P.U.C. 369 [PUC retains discretion to apportion reimbursement of maintenance costs under federal aid program]; *Matter of Southern Pacific Company* (1967) 67 Cal.P.U.C. 375, 378, affd. on rehg. (1968) 68 Cal.P.U.C. 198 (S.F. No. 22603, petn. for writ of review den.) ["Commission may

The PUC's undisputed jurisdiction over various safety features of Wine Train's operations provides a second independent basis for holding that Wine Train constitutes a project within the scope of CEQA.[15] Pursuant to section 1202 of the Public Utilities Code, the PUC has "exclusive" and plenary power: "(a) To *determine and prescribe* the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use, and protection of each crossing . . . of a public or publicly used road or highway by a railroad or street railroad, and of a street by a railroad or vice versa. [¶] (b) To *alter, relocate, or abolish* by physical closing any such crossing . . . . [¶] (c) To require, where in its judgment it would be practicable, a separation of grades at any such crossing . . . and to *prescribe* the terms upon which such separation shall be made and the proportions in which the expense . . . shall be divided . . . ." (Pub. Util. Code, § 1202, subds. (a), (b) & (c), italics added; see *Breidert v. Southern Pac. Co.* (1969) 272 Cal.App.2d 398, 406-407 [77 Cal.Rptr. 262]; *City of Union City v. Southern Pac. Co.* (1968) 261 Cal.App.2d 277 [67 Cal.Rptr. 816].) As to private crossings, the PUC "shall have the authority *to determine* the necessity for any crossing and the place, manner, and conditions under which the crossing shall be constructed and maintained . . . ." (Pub. Util. Code, § 7537, italics added.)

Further, the PUC "may, after a hearing, by general or special orders, rules, or otherwise, *require* every public utility to construct, maintain, and operate its line, plant, system, equipment, apparatus, tracks, and premises in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public, and *may prescribe,* among other things, the installation, use, maintenance, and operation of appropriate safety or other devices. . . ." (Pub. Util. Code, § 768, italics added.) The PUC also prescribes the frequency and location for the ringing of railroad bells and whistles at railroad crossings (Pub. Util. Code, § 7604), and the nature and placement of locomotive headlights (Pub. Util. Code, § 7607).

exercise its inherent power to apportion maintenance costs in any manner it deems appropriate."].)

[15] The majority's footnote 11 at page 377 discloses an inexplicable failure or refusal to face squarely the issue presented by this case. Contrary to the assertion of the majority, I do *not* argue that "even if the institution of passenger service is exempt from CEQA, Wine Train must still submit that project to the environmental review process because the PUC has power to regulate the safety aspects of railroad operation." The dissent's point is that the exemption set forth in section 21080, subdivision (b)(11) does *not* apply. Obviously, if the Wine Train proposal is exempt from CEQA under section 21080, subdivision (b)(11), then the PUC's authority over various safety features of Wine Train's operations is irrelevant. The PUC's authority over safety is discussed here only insofar as it relates to the question of federal preemption. That question must be addressed because, contrary to the conclusion of the majority, the exemption set forth in section 21080, subdivision (b)(11) is not applicable in this case.

It is undisputed that federal law expressly preserves a measure of state jurisdiction over railroad safety features of the foregoing nature. Both federal and state decisions have interpreted the Federal Rail Safety Act (FRSA) (Pub.L. No. 91-458, 84 Stat. 971 (1970) (codified as amended at 45 U.S.C. §§ 421-444)) to permit the PUC and other state utility commissions to prescribe safety standards for intrastate railroad lines.[16] (See *Southern Pacific Transp.* v. *Public Utilities Com'n* (N.D.Cal. 1986) 647 F.Supp. 1220, affd. 820 F.2d 1111; *Missouri Pacific R. Co.* v. *Railroad Com'n of Texas* (5th Cir. 1987) 833 F.2d 570, 575; *Ill. Cent. Gulf R.* v. *Tenn. Pub. Serv.* (Tenn.Ct.App. 1987) 736 S.W.2d 112.) The court in *Southern Pacific Transp.*, for example, rejected the contention that the FRSA preempted the PUC's authority to enact general orders, pursuant to section 768 of the Public Utilities Code, prescribing minimum clearances between freight cars and structures beside and above railroad tracks, and requiring that Southern Pacific maintain a continuous walkway on each side of its tracks. (647 F.Supp. at pp. 1224-1227; accord *Missouri Pacific R. Co., supra*, 833 F.2d at pp. 574-576; *Ill. Cent. Gulf R., supra*, 736 S.W.2d at pp. 115-116.)

Wine Train does not dispute the validity of these decisions. It does, however, appear to contend that they do not confer jurisdiction on the PUC to compel CEQA compliance. To the extent that this argument relies on the same "bootstrap" theory advanced earlier, it is clearly without merit for the reasons already stated. The safety measures over which the PUC may exercise discretionary authority—the construction, alteration and maintenance of crossings and warning devices, passenger safety at Wine Train stations and crossings, the ringing of bells and sirens at crossings and stations—may have a direct bearing on the environmental impact of the project as a whole.[17] As the court cogently explained in *Friends of Westwood, Inc.* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259, 267 [235 Cal.Rptr. 788], "the touchstone is whether the approval process involved allows the government to shape the project in any way which could respond to any of the concerns which might be identified in an environmental impact report." The PUC's discretionary authority over these and other safety aspects of Wine Train's

---

[16] Section 205 of the FRSA, 45 United States Code section 434, in pertinent part provides: "A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce."

[17] The FRSA may, of course, preempt local safety requirements where the federal government has manifested an intent to occupy the field. (45 U.S.C. § 434.) There has been no showing here, however, that the PUC's authority over crossings, warning devices, sirens, and other safety features of Wine Train's operations has been preempted.

operations clearly may influence how the Wine Train project affects the local environment.

Wine Train also appears to argue that the PUC's approval authority does not make it a project under section 21065, subdivision (c), because the PUC lacks the ultimate franchising authority to approve or disapprove its operation. Wine Train, however, misses the basic point. Regardless of whether Wine Train inherited Southern Pacific's license to operate, the PUC retains authority to review, approve, and if necessary modify various safety features of Wine Train's operations, features which directly or ultimately may affect the environment. Under settled authority, that is sufficient to make it a project subject to CEQA review. (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 795; *Bozung* v. *Local Agency Formation Com., supra*, 13 Cal.3d at pp. 283-284.) Thus, the proposal plainly satisfies the definition of a "project" under section 21065, subdivision (b) for purposes of requiring CEQA compliance.

C. *When Was PUC Authorized to Compel CEQA Review?*

Having concluded that Wine Train constitutes a project under CEQA, and having further concluded that the PUC has jurisdiction to require CEQA compliance, it remains to be determined *when* the PUC was properly authorized to exercise its environmental review authority. As will be recalled from the discussion in part II.A., *ante,* the answer bears on the applicability to this case of the exemption for "rights-of-way *already* in use." (§ 21080, subd. (b)(11), italics added.) As noted earlier, the proper referent of "already" would appear to be the time at which the responsible agency is authorized to require an EIR. We must decide, therefore, the point in time when the PUC was authorized to compel CEQA compliance in order to determine whether the line was "already" in use under section 21080, subdivision (b)(11).

The fundamental purpose of CEQA is to ensure "that environmental considerations play a significant role in governmental decision-making." (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d at p. 263.) Consequently, we have consistently interpreted CEQA to authorize, indeed to require, environmental review of private projects "at the earliest possible stage." (*Bozung* v. *Local Agency Formation Com., supra*, 13 Cal.3d at p. 282; accord, *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 797.) The CEQA Guidelines embody this principle as well. Thus, "EIRs and Negative Declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to

provide meaningful information for environmental assessment." (CEQA Guidelines, § 15004, subd. (b); see also *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 395 [253 Cal.Rptr. 426, 764 P.2d 278]; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 77, fn. 5.)

The reason for early review is self-evident. Often described as an environmental "alarm bell" (see *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 241 [227 Cal.Rptr. 899]), the EIR is designed to alert the public and its responsible officials to environmental changes *before* they have reached "ecological points of no return" (*ibid.*), and to "demonstrate to an apprehensive citizenry that the agency has *in fact* analyzed and considered the ecological implications of its action." (*No Oil Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 86, italics added.)

The majority opinion suggests that the "first occasion" for the PUC to compel an environmental assessment of Wine Train was March 1988, when real parties filed their complaint. (Maj. opn., *ante,* at p. 378, fn. 12.)[18] The record indicates otherwise. In early autumn 1987, Wine Train initiated the process for receiving from the PUC reimbursement for the costs of altering and maintaining crossing warning devices. The PUC, in response, wrote a series of letters to Wine Train indicating that, as the "public agency with the greatest responsibility for supervising or approving the project as a whole" (CEQA Guidelines, § 15051), and with the concurrence of the other public agencies involved (the Cities of Napa and St. Helena and the Town of Yountville), it was acting as the "lead agency" for CEQA purposes (§ 21067); that in light of Wine Train's request for financial assistance and the PUC's control over various safety aspects of Wine Train's operation, the Wine Train proposal constituted a CEQA project for which an initial environmental assessment would be required (§ 21065); and that Wine Train's request for funding was being held in abeyance pending clarification of the jurisdictional issue. Wine Train, in response, denied that the PUC had jurisdiction over its operations and rejected the PUC's request to submit to an initial environmental assessment pursuant to CEQA.

Although, as this court has noted elsewhere, the timing of an environmental study can present a "delicate problem" (*Fullerton Joint Union High*

---

[18] The majority's footnote 12, *ante,* at page 378, presents two problems: (1) the transfer to Wine Train was completed in April 1987, not 1986; and (2) the November 1984 letter quoted by the majority was signed by an "associate transportation engineer." This letter did not, and does not, reflect the PUC's position in this matter. I can only assume that its appearance in the majority opinion is calculated, as Wine Train's counsel at oral argument so aptly put it, for "rhetorical purposes" only.

*School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 797), I have no doubt that the PUC's timing in this matter was absolutely correct. The transfer from Southern Pacific to Wine Train was not complete until April 1987. Any attempt to compel CEQA compliance before that date would obviously have been premature. By September and October of 1987, however, the record shows that the full thrust of Wine Train's proposal had been disclosed, and Wine Train had taken affirmative steps to obtain financial assistance through the PUC. The PUC's effort in the fall of 1987 to compel CEQA compliance, therefore, appears to have truck the proper balance; it was early enough to influence future development, but late enough to ensure a meaningful review. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d at p. 395.) Moreover, it was properly coordinated with the PUC's legitimate oversight authority under section 21065.

### D. *Was the Rocktram-Krug Line Already in Use?*

The PUC expressly determined the Rocktram-Krug line was not "already in use" within the meaning of section 21080, subdivision (b)(11). The PUC's determination is supported by substantial, indeed overwhelming, evidence and should be upheld. (*City and County of San Francisco* v. *Public Utilities Com.* (1985) 39 Cal.3d 523, 530 [217 Cal.Rptr. 43, 703 P.2d 381]; *Yucaipa Water Co. No. 1* v. *Public Utilities Com.* (1960) 54 Cal.2d 823, 828 [9 Cal.Rptr. 239, 357 P.2d 295].) By early autumn of 1987, the Rocktram-Krug line had been in a state of *disrepair and disuse for over two and one-half years. No trains had traversed the line since late 1984 or early 1985.* No passenger service had existed for over 50 years. Freight traffic had declined to several hundred cars a year in 1982 and 1983, and 58 cars in the first 6 months of 1984. In one of its detailed public relations circulars, Wine Train noted that people had taken to using the tracks for running, and children were playing near the tracks. Thus, the record reveals that the Rocktram-Krug line was not, and for over two and one-half years had not been, in actual use when the PUC properly ordered CEQA compliance. The conclusion is thus inescapable that the line was not "already in use" under section 21080, subdivision (b), and that the exemption therefore does not apply.

The majority opinion argues that a right of way is not "lost" or "destroyed" so long as it was once in use and the operator has "not intentionally abandoned it." (Maj. opn., *ante*, at p. 379.) The point is correct but irrelevant. As noted earlier, the question here is not abandonment, but actual use. Nowhere, however, does the majority confront the real question. As I have attempted to demonstrate, it is plainly erroneous to conclude that a line is "in use" so long as tracks are in "existence" and the line has not

been abandoned. The only plausible meaning, the only sensible meaning, and the only legal meaning possibly attributable to "in use" is actual operation. Clearly, a line that lies fallow and in a state of disrepair for over two and one-half years prior to environmental review cannot, in my view, reasonably be said to be "already in use."[19]

*Tamalpais etc. Co.* v. *N.W. Pac. R.R. Co., supra,* 73 Cal.App.2d 917, on which the majority opinion relies, does not hold otherwise. The issue in that case turned, in part, on whether a railroad right-of-way or some part thereof had been abandoned. The court rejected plaintiff's argument that the evidence satisfied the requirement of nonuse, noting that although the line had ceased to carry passengers after 1941, it had continued to carry freight on an "on call" basis every year thereafter to the date of trial. (*Id.* at p. 921.) Unlike the case at bar, therefore, there was no sustained period of nonuse and disrepair.

In short, the record here amply supports the conclusion that the Rocktram-Krug line was not "already in use" under section 21080, subdivision (b)(11) when the PUC properly directed that Wine Train submit to an environmental assessment, and therefore Wine Train was not exempt from the requirements of CEQA.

### CONCLUSION

The PUC properly and regularly pursued its authority in restraining Wine Train from operating until it had submitted to an environmental assessment pursuant to the requirements of CEQA. Accordingly, I would affirm its order.

Broussard, J., concurred.

---

[19] The majority opinion erroneously characterizes the PUC's finding that the Rocktram-Krug line was not already in use as based on an implicit assumption that the exception "applies only when there has been uninterrupted rail traffic" or "continuous" use. (Maj. opn., *ante,* at p. 380, fn. 15.) The PUC finding implies nothing of the kind; it was based, as noted, on the fact that the line was out of use for over two and one-half years. The PUC finding does *not* imply a requirement of uninterrupted or continuous use.