[No. D033138. Fourth Dist., Div. One. Mar. 7, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES WILLIAM TURNER, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, IV and V.

1132

**COUNSEL**

Lynne G. McGinnis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda L. Cartwright-Ladendorf and Bradley L. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, J.**—James William Turner appeals from a judgment after his second trial ordering his two-year commitment to the custody of the State Department of Mental Health (DMH) following a jury finding he is a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (the Act) (Welf. & Inst. Code,[2] § 6600 et seq.). Turner contends the jury's determination should be set aside because the trial court should have granted his in limine motion to dismiss, there was insufficient evidence to show he suffers from emotional or volitional impairment, the court erred in admitting hearsay evidence of alleged "bad acts" other than that of the predicate offenses, the court erred in refusing to allow his daughter to testify, and the version of CALJIC No. 4.19 given the jury impermissibly reduced the People's burden of proof.

In the published portion of this opinion, we shall determine that the trial court correctly denied a motion to dismiss the petition to declare Turner an SVP under the Act after a mistrial was declared following the first trial on the petition which resulted in a deadlocked jury. In the unpublished portions, we reject Turner's remaining contentions of error. Accordingly, we affirm the judgment.

## BACKGROUND

### Summary of the Act

Although our Supreme Court in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*) has provided a thorough review of the statutory scheme comprising the Act (see *Hubbart, supra,* at pp. 1143-1149), for the convenience of the reader, we repeat pertinent provisions relevant to the issues in this case.

The Act, which is contained in section 6600 et seq., provides for the continued confinement in the custody of the DMH of those persons identified as SVP's before they have completed their prison or parole revocation

---

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified.

terms. It defines an SVP as "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence[3] and who has a diagnosed mental disorder[4] that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a).)

If the Department of Corrections (DOC) determines the inmate approaching sentence completion may be an SVP, it refers him or her for evaluation to see if the inmate falls under the Act. (§ 6601, subds. (a)(1), (b), (c) & (d).) When the evaluation reveals the inmate has suffered the required qualifying prior convictions (§§ 6600, subds. (a), (b), 6600.1) and two licensed psychologists and/or psychiatrists agree the inmate "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody," the DMH transmits a request for a petition for commitment under the Act to the county in which the alleged SVP was last convicted, with copies of the evaluation reports and other supporting documents. (§ 6601, subds. (d), (h) & (i).) If a designated county's attorney concurs in the request, a petition for commitment is filed in that county's superior court. (§ 6601, subd. (i).)

Once filed, the superior court holds a hearing to determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory[5] criminal behavior upon his or her release. (§ 6602, as amended by Stats. 1996, ch. 4, § 4, and by Stats. 1998, ch. 19, § 3, ch. 961, § 4.) If such is found, the judge "shall" order that a trial be conducted "to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release." (§ 6602, subd. (a).)

The person subject to a trial under the Act is to remain in custody in a secure facility until the trial is completed. (§ 6602, subd. (a).) That person is

---

[3] "A 'sexually violent offense' refers to certain enumerated sex crimes 'committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person.' (§ 6600, subd. (b), citing Pen. Code, §§ 261, subd. (a)(2) [rape of non-spouse], . . . 264.1 [rape in concert], . . . 288a [oral copulation]. . . .)" (*Hubbart, supra,* 19 Cal.4th at p. 1145.)

[4] Although a "diagnosed mental disorder" is not fully defined under the Act, such condition is stated to "include[] a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

[5] The Act defines "predatory" as "an act . . . directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

entitled to trial by jury, the assistance of counsel, the right to retain experts or professional persons to perform further evaluations, and access to relevant medical and psychological reports. (§ 6603, subd. (a).) The trier of fact must determine beyond a reasonable doubt whether the person named in the petition is in fact an SVP. (§ 6604.) If the person is determined to be an SVP, he or she shall be committed to the custody of the DMH for two years "for appropriate treatment and confinement in a secure facility . . . ," subject to annual review and extension of commitment if the diagnosed mental disorder and the consequent danger to the community persists. (§§ 6604, 6605.) "[T]he person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a new petition for commitment under [the Act] . . . ." (§ 6604.)

## Factual Summary

On August 7, 1984, a jury convicted Turner of forcible oral copulation and forcible oral copulation in concert (Pen. Code, § 288a, subds. (c) & (d)). For these sex crimes against the same victim, Turner was sentenced to prison for nine years. On January 23, 1985, a jury convicted Turner of forcible oral copulation, forcible oral copulation in concert and oral copulation in jail against two victims (Pen. Code, § 288a, subds. (c), (d) & (e)), and he was subsequently sentenced to prison for 16 years full strength consecutive to his earlier term.

On May 14, 1998, a petition was filed by the District Attorney of San Diego County alleging that Turner was an SVP under the Act. Based on the above convictions, determinate sentence and the reports of two psychiatric professionals who concurred, after separate evaluations, that Turner fit the Act's statutory qualifications, the People requested the superior court commence proceedings under the Act to determine whether Turner should be committed as an SVP. After finding probable cause Turner qualified under the Act as an SVP (§ 6602), the court set the matter for trial. A trial commenced December 4, 1998. On December 14, 1998, the court declared a mistrial after the jury reached a deadlock and set the matter for a new trial.

After the trial court denied Turner's motion to dismiss the petition under the Act, Turner filed a petition for writ of habeas corpus and a request for stay with this court which, after being read and considered, was denied without opinion. (*In re Turner* (Feb. 25, 1999, D032916).)[6] The retrial to determine whether Turner was an SVP under the Act commenced on February 26, 1999.

---

[6]We have granted the parties' request to take judicial notice of our own file in the habeas proceeding. (Evid. Code, § 452.)

At trial, the People presented the testimony of the two clinical psychologists, Drs. Gary Zinik and Hy Malinek, who had performed the earlier clinical evaluations[7] submitted with the petition. In addition to conducting the interviews, after reviewing Turner's police, probation, prison, court and medical records in light of the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV) used by those in the psychiatric field, both doctors diagnosed Turner as suffering from sexual sadism, a type of paraphilia,[8] from substance abuse in institutional remission[9] and antisocial personality disorder. Each also found Turner had previously committed two or more qualifying offenses under the Act. Each expert explained about his interview procedures, his "mental status exam" of Turner,[10] and his questioning of Turner about the predicate offenses as well as Turner's extensive criminal history.

Turner admitted to both experts he had committed the predicate offenses, and that he had orally copulated at least 20 boys while he was at California Youth Authority (CYA). Zinik related in detail the accounts Turner gave in the interview of his sexual assaults on male victims.[11] Turner told Zinik he was getting back at Whites for the way they had treated him in the past and that he enjoyed humiliating and terrorizing them. He also told Zinik it was a sexual turn-on to force the boys, and then later the men in the jails, to do the things he required them to do. He further admitted there were several other victims in CYA and the jails that were never reported. Turner denied the three sexual assaults he had been charged with against women.[12]

---

[7]Zinik had interviewed Turner on April 6, 1998. Malinek testified he had interviewed Turner on April 8, 1998, but his written report stated he did so on the 9th.

[8]Zinik also diagnosed Turner as suffering from paraphilia NOS, or paraphilia not otherwise specified. He explained he arrived at this diagnosis due to Turner's two types of sexual crimes, oral copulation with violence against nonconsenting White males and his less violent rapes against nonconsenting minority women.

[9]Zinik opined Turner suffered from alcohol and polysubstance abuse, and Malinek thought he suffered from opiod-heroin abuse.

[10]The result of the "mental status exam" showed that Turner did not have any signs of thought disorder, a psychosis or any problems with reality orientation.

[11]Turner admitted to Zinik that on April 25, 1984, while in the San Diego County jail serving time on a gambling offense, as "tank commander" he assigned a new 23-year-old White male inmate to his cell and then together with another Black inmate called the young man "White cakes" and "White bitch" before climbing on the man's bunk, threatening and hitting him and finally forcing him to orally copulate Turner. The male victim vomited and required tranquilizers after Turner ejaculated in his mouth.

Turner also admitted that on both July 23 and 30, 1984, while in the courthouse holding tank of the San Diego County jail, he committed additional sexual assaults against young White male inmates. In both cases, Turner grabbed and forced his erect penis into the victim's mouth until he ejaculated.

[12]On cross-examination, Zinik conceded Turner had never been convicted of rape against a woman. However, he related that when he questioned Turner about one charged

Without going into the facts of the cases, Zinik also related that Turner acknowledged in the interview his long criminal history which showed he had been arrested 31 times by the time he turned 26 years of age for offenses showing some violence. Then relying on Turner's prison records and a report from one of Turner's experts, which contained admissions by Turner, Zinik testified about Turner's additional crimes and rule violations committed while in prison, including one rule violation in July 1986 for indecent exposure where Turner had dropped his shorts, exposed his penis and waved it at a female prison guard in "a threatening manner." Zinik believed that Turner had showed no remorse for the things done to his victims and had smiled while he answered Zinik's questions about them.

Zinik opined Turner was a "complete psychopath" whose diagnosed mental disorders predisposed him to commit sexually violent crimes in the future. Zinik felt it was "just a matter of time before [Turner] commits some other sexual offense when he's released." Although Turner had had no reported sex offense since 1986, based on risk prediction factors/traits identified in various tests and studies,[13] Zinik opined Turner was more likely than not to reoffend sexually if released and thus met the criteria for commitment as an SVP.

Malinek, like Zinik, found Turner to be psychopathic because he scored 5 on the RRASOR test. Malinek opined that because of Turner's diagnosed mental disorders he was more likely than not to engage in future sexually violent behavior.[14] Malinek related that during his interview with him, Turner explained he "needed to 'strike out at the system' . . . ." Concerning his sexual assault against one young White man in 1984, Turner told Malinek that "[t]here's a rage every day. I don't like White people. These are ways to vent my rage. Half of our [B]lack children are living below poverty. [I] couldn't get them [sic] White people so I got somebody that looked like them." Turner also claimed that during his CYA years, he had

---

rape-in-concert case, Turner conceded he had had sex with the female victim, but claimed she consented to having sex with him and his two friends. When Turner was queried about another charged rape that was pled out to a false imprisonment conviction, Turner denied threatening the woman, wanting to have sex with her or trying to rape her and told Zinik he only kept her in his car and wouldn't let her out for a period of time.

[13]Zinik gave Turner the Hare Psychopathic Checklist (Hare) test and the Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR) test and conducted an evaluation of the risk prediction factors identified in a study by Canadian researchers R. Karl Hanson and Monique T. Bussiere. Turner scored 39 out of 40 on the Hare and a 5 on the RRASOR, meaning he has a 48.8 percent chance of sexually reoffending within five years and 73.1 percent probability of doing so in 10 years.

[14]Malinek's opinion was based on Turner's past behavior, the fact his victims were males and strangers, his past offenses involved violence and anger, Turner's attitude of endorsing sexual violence and his score on the RRASOR.

forced oral sex "every time he came in contact with White people." Like Zinik, Malinek found Turner unremorseful and proud of his earlier behavior. When Malinek asked Turner whether he would likely return to prison if released, Turner responded: "I don't know. I would do what I have to do to live constructively. If I come to a situation where I may need money, I may commit a serious crime. I'm not somebody to sleep on a sidewalk bench. If the price is prison for the man I want to be, so be it. Hopefully I won't endeavor on crime. If I commit a crime, it wouldn't be a sexual crime; it would probably be more about getting some money."

In addition to Turner's testimony, a Muslim chaplain at Lancaster State Prison where Turner was last housed, and two psychiatric professionals testified in his defense. The Arabic Muslim chaplain testified Turner had been well respected in the prison Muslim community, one of only two inmates allowed to give sermons and supported his efforts against the racism of fellow Muslim inmates.

Forensic psychologist Shayna Gothard, who had been retained by the defense to do a "dangerousness assessment" of Turner, testified that after reviewing his records and interviewing him, she found his past crimes against White inmates had been primarily motivated by anger rather than sex. Although she agreed Turner suffered from antisocial personality disorder, she felt that he did not currently have a sexual disorder that would make him a danger to others and his substance abuse was in complete remission. Gothard related specific facts in the prison reports that showed Turner's violations in the past 13 years had become decreasingly aggressive and "increasingly sparse." She attributed the changes in his behavior to his conversion to Islam, his marriage, communication with his daughter, a greater appreciation of right and wrong and the consequences of any future criminal acts.

Dr. Theodore Donaldson, a clinical and forensic psychologist, also testified on Turner's behalf. Although he agreed Turner was a psychopath, after reviewing Turner's materials and interviewing him, he disagreed that Turner had any volitional impairment, that he suffered from sexual sadism or any other paraphilia or that there was any relationship between such diagnosis based on the DSM-IV and any prediction of reoffending sexually. Donaldson believed Turner's prior offenses were motivated by a desire for power and intimidation. Based on Turner's recent major lifestyle changes and lack of criminal behavior or prison violations, Donaldson opined Turner was less likely to recommit than his RRASOR score suggested.

In Turner's testimony in his defense, he admitted he had committed the predicate crimes, the sex crimes at CYA, other nonsexual violent crimes and

the various prison violations and crimes, including the sexual assault of the prison guard. Turner explained he had committed the sexual acts while in custody because of frustration, aggravation and rage toward Whites. He had just gotten caught up in the "predatory-type environment" and institutional violence.

While denying he had committed any rapes on female victims, Turner conceded he had been with other friends who raped a woman when he was 15 years old. As to the other charged rapes in his history, Turner explained that one had been for the alleged rape of a friend's prostitute whom he only had consenting sex with, and the other had involved the mother-in-law of a boy he had known in CYA who approached him, got in his car, drank and did "stuff" with him before he dropped her off at her boyfriend's house. Turner assumed the woman had reported he raped her because of his feud with her son-in-law.

Turner testified about his conversion to Islam, claiming "I consider Islam to be my health treatment." Because of such religion, he stopped smoking, doing drugs and committing any further sexual acts in prison. Turner stated he was in constant contact with his daughter and plans to work and participate in the Muslim community when he is released.

On cross-examination, Turner conceded he had continued to commit violent acts in prison even after his conversion to Islam, and that he has four other children with whom he has had no contact since his incarceration. He further claimed his sexual assault on the female prison guard had been merely a "macho statement."

After considering all the trial evidence, the jury returned a verdict finding Turner an SVP.

## DISCUSSION

### I

### *Motion to Dismiss*

 Before the second trial in this matter, Turner brought a motion to dismiss on grounds section 6604 mandated his immediate release on parole because the jury was unable to agree on a verdict or finding he was an SVP beyond a reasonable doubt. Turner argued the plain language of the second sentence of section 6604 provides that if there is no requisite finding beyond a reasonable doubt then there is an automatic acquittal. The People responded the motion was untimely and because the totality of the language of

section 6604 required the jury to find beyond a reasonable doubt before making a determination, a mistrial is not a verdict. The People also pointed out that the first jury had reached a deadlock of 10 for finding the petition true.[15] After considering the matter, the trial judge denied the motion.

Afterwards, the court gave Turner time to bring a petition for writ of habeas corpus and a request for an immediate stay in this court, which we summarily denied. (*In re Turner, supra*, D032916.) The matter then proceeded with in limine motions and trial.

On appeal, Turner contends the trial court's interpretation of section 6604 calls the constitutionality of the Act into question because it would impermissibly allow "the State to hold indefinitely . . . any convicted criminal, even though he has completed his prison term." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 82-83 [112 S.Ct. 1780, 1787, 118 L.Ed.2d 437].) He argues section 6604 is ambiguous, subject to two interpretations, and therefore should be construed to prevent successive trials where, as here, the trier of fact cannot make a finding beyond a reasonable doubt that a person is an SVP. Turner thus asserts the section as worded bars retrial.[16] We disagree.

■ We review the pertinent section of the Act under well-established rules of statutory construction which require us "to ascertain the intent of the lawmakers so as to effectuate the purpose of the [statute.] [Citations.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420]; see also *People v. Superior Court (Johannes)* (1999) 70 Cal.App.4th 558, 564 [82 Cal.Rptr.2d 852].) To do so, we examine the relevant language of the statute and "accord words their usual, ordinary, and common sense meaning based on the language . . . used and the evident purpose for which the statute was adopted." (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789].) In interpreting any particular provision of a statute, we do not insert words into it as such would "violate the cardinal rule that courts may not add provisions to a statute. [Citations.]" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

---

[15]The clerk's transcript reflects the jury was deadlocked 10 for finding the petition true, one for finding the petition not true and one abstention.

[16]Turner correctly notes that the People's claim he is estopped from raising this issue on appeal because this court had already denied it after "reading and considering" his earlier petition for writ of habeas corpus, is contrary to established California law. (*People v. Medina* (1972) 6 Cal.3d 484, 493 [99 Cal.Rptr. 630, 492 P.2d 686], disapproved of on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888, 896-899 [12 Cal.Rptr.2d 728, 838 P.2d 250].) As the court in *People v. Allison* (1988) 202 Cal.App.3d 1084 [249 Cal.Rptr. 218], relying on *Medina*, stated: "[W]e denied the People's petition . . . without opinion and as an act of discretionary denial. That appellate order does not conclusively evidence that denial was upon the merits and so, it neither bars nor governs this decision. [Citations.]" (*People v. Allison, supra*, 202 Cal.App.3d at p. 1088.)

Nor are we permitted to rewrite the statute to conform to an assumed intent that does not appear from its plain language. (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 381 [267 Cal.Rptr. 569, 787 P.2d 976].) We presume the Legislature in enacting a law "is deemed to be aware of statutes and judicial decisions already in effect and to have enacted the new statute in light thereof." (*People v. Hernandez* (1988) 46 Cal.3d 194, 201 [249 Cal.Rptr. 850, 757 P.2d 1013], disapproved on another point in *People v. King* (1993) 5 Cal.4th 59, 78, fn. 5 [19 Cal.Rptr.2d 233, 851 P.2d 27].) "[W]e do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*People v. Pieters*, *supra*, 52 Cal.3d at p. 899.)

With these rules in mind, we turn to the pertinent language of the Act in question. Section 6604 of the Act provides in pertinent part that: "The court or jury shall determine whether, beyond a reasonable doubt, the person is [an SVP]. If the court or jury is not satisfied beyond a reasonable doubt that the person is [an SVP], the court shall direct that the person be released at the conclusion of the term for which he or she was initially sentenced, or that the person be unconditionally released at the end of parole, whichever is applicable. If the court or jury determines that the person is [an SVP], the person shall be committed for two years to the custody of the [DMH] for appropriate treatment and confinement in a secure facility designated by the Director of [the DMH], and the person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a new petition for commitment. . . ."

By its plain language, section 6604, among other things, sets forth the burden of proof required for making a "finding" that a person is an SVP under the Act. Our Supreme Court has long held that such beyond a reasonable doubt burden of proof is required in civil commitment proceedings because "the interests involved in [such] proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201].) It has also held that for the same reasons, a person subject to such proceedings is entitled to a unanimous verdict rather than the usual three-fourths' agreement for a regular civil verdict. (*People v. Feagley* (1975) 14 Cal.3d 338, 351 [121 Cal.Rptr. 509, 535 P.2d 373].) This requirement is codified in section 6603, subdivision (d) of the Act which specifically provides that "[a] unanimous *verdict* shall be

required in any jury trial." (Italics added.) Subdivision (e) of section 6603 further provides that "[t]he court shall notify the [DMH] of the *outcome* of the trial by forwarding to the department a copy of the minute order of the court within 72 hours of the *decision*." (Italics added.)

When the unanimity and finality requirements of section 6603 are read together with the burden set forth in section 6604, they provide, as the trial court correctly noted, that only if a jury makes a final unanimous finding, verdict, outcome or decision that the People failed to meet the required burden beyond a reasonable doubt, is the alleged SVP to be released. We therefore believe the only reasonable construction of section 6604 is that it requires the jury or court to make a "finding," or render a verdict or decision, it is satisfied beyond a reasonable doubt the alleged person is either an SVP or there are doubts whether he is an SVP. To hold such section to bar retrial if no finding or verdict can be made either way, as Turner would have us do, would thwart the purpose of the Act to protect the public from "a small but extremely dangerous group of [SVP's] that have diagnosable mental disorders . . . identified while they are incarcerated." (Stats. 1995, chs. 762 & 763, § 1; see also Historical and Statutory Notes, 73 West's Ann. Welf. & Inst. Code (1998 ed.) foll. § 6600, pp. 249-250.) By enacting the Act, the Legislature intended to confine and treat such identified individuals "until such time that it can be determined that they no longer present a threat to society." (*Ibid.*) Our Supreme Court has found such civil commitment scheme constitutional because it ensures that the SVP does not " 'remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness' [(Citation), and the SVP] is entitled to unconditional release and discharge if he prevails in [a] proceeding [under the Act]. [Citation.]" (*Hubbart, supra,* 19 Cal.4th at p. 1177.)

Although the Act does not specifically provide for retrial if there is a hung or deadlocked jury, as the trial court properly found, such is implied when all sentences of section 6604 are considered with the Act's "finality" requirement that the jury finding be unanimously determined beyond a reasonable doubt. As the People note, if there is not a final determination, true finding or verdict in a civil case under the appropriate burden of proof, the action may be tried again as the court may direct. (Code Civ. Proc., § 616.)[17] We presume the Legislature was well aware of both this long-standing civil statutory provision permitting retrial where a jury deadlock results in a

---

[17]Code of Civil Procedure section 616 provides: "In all cases where the jury are discharged without having rendered a verdict, or are prevented from giving a verdict, by reason of accident or other cause, during the progress of the trial, or after the cause is submitted to them, except as provided in section 630, the action may be again tried immediately, or at a future time, as the court may direct." Code of Civil Procedure section 630 provides for a directed verdict under certain circumstances not pertinent here.

mistrial and the application of the unanimity requirement of the beyond a reasonable doubt standard for civil jury trial commitments when it enacted the Act.

Turner construes the second sentence of section 6604 in a vacuum. To interpret that sentence alone as he does to bar retrial, we would have to ignore the entire civil commitment scheme of which it is a part and rewrite the section or insert words into it, which we cannot do. (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 827; *In re Rojas, supra,* 23 Cal.3d at p. 155.) Rather, our interpretation of the pertinent language of section 6604 is consistent with the rules of statutory construction (see *People v. Pieters, supra,* 52 Cal.3d at pp. 898-899) and comports with the Legislature's express intent that the Act provide protection for the public from identified SVP's.

Because we hold that section 6604 does not bar retrial if there is no unanimous jury "finding" beyond a reasonable doubt, we conclude the trial court properly granted a mistrial and denied Turner's motion to dismiss.

II-V*

. . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 14, 2000.

---

*See footnote 1, *ante,* page 1131.